## McCREE & COMPANY v. STATE.

91 N. W. (2d) 713.

August 1, 1958—No. 37,316.

*Miles Lord,* Attorney General, *Robert W. Mattson,* Deputy Attorney General, and *D. P. Kane,* Special Assistant Attorney General, for appellant.

*Roland J. Faricy, B. Warren Hart, Marvin J. Pertzik,* and *Faricy, Moore & Costello,* for respondent.

NELSON, JUSTICE.

McCree & Company brings this action against the State of Minnesota to recover damages for an alleged breach of warranty arising out of a contract for the improvement of Trunk Highway Nos. 14 and 22 in southern Minnesota, in the vicinity of the city of Mankato, and also to recover an amount which has been withheld by the state. The Highway Department engineers started work in the fall of 1950 on plans and specifications for the improvement. Subsequent to April 2, 1951, the state advertised for competitive bids, and, within 15 days after receiving notice of the advertisement for bids, plaintiff submitted its bid bearing date April 27, 1951. The contract was let to plaintiff as low bidder on the same date. A formal contract, drafted in its entirety by the state,

was thereafter entered into between the parties pursuant to existing highway regulations and requirements.

The plans and specifications, which were made a part of the contract, required the plaintiff to compact the soil used as embankment material to a specified density tested by the standard laboratory method of tests for the compaction and density of soils. Relying upon the state's plans and specifications providing for strict compliance under supervision and inspection by the state's engineers, plaintiff contends that it was led to believe and did believe that the soil materials could be compacted as specifically required by the state therein. The plaintiff as contractor was given no right to deviate from the plans and specifications under the contract provisions. The following contract clauses are indicative of the extent to which the terms of the contract were obligatory upon plaintiff both as to performance and the accomplishment of results. Section 1401 states that "The intent of the Plans and Specifications is to prescribe a complete improvement. No deviations from the Plans shall be made unless authorized by the Engineer." Section 1502 states "All work shall be done in accordance with the lines, grades and dimensions shown in the Plans except as otherwise ordered by the Engineer." Section 1509 states "Any unauthorized work may be ordered removed and replaced at the Contractor's expense."

We think it clear from the foregoing that one of the main issues presented on this appeal is whether the state impliedly represented and agreed in its contract with plaintiff that soil conditions at the work site were such as to make it practicable to perform the prescribed work pursuant to plans and specifications; that the provisions of the contract contained practicable directions for doing and completing the work; and that these were adequate and sufficient for the purposes therein stated.

The testimony on behalf of the plaintiff is to the effect that it was compelled to rely and did rely upon the representations and agreement on the part of the state that the soil conditions were suitable and sufficient to make it practicable to comply with the plans and specifications and for the plaintiff to perform the work to completion in the very definite and specific manner prescribed. The plaintiff had been obligated by the terms of the contract to compact the embankment

material between what has been described as stations 31 and 46 to a degree of density specifically required in the plans and specifications. However, in an attempted course of construction throughout the area between stations 31 and 46 plaintiff found it impossible to get compaction to the specified density. It is contended by plaintiff that this was due to the wet condition of the underlying soil and its plastic nature in that area which made it impossible to accomplish compaction by the methods prescribed and definitely required in the plans and specifications prepared and furnished by the engineers for the state.

A reading of the record indicates that the conditions at the work site made it obvious that compaction could not be achieved under the state's plans and specifications without the state's authorization to deviate therefrom. Plaintiff brought these facts to the attention of the state's engineers as soon as the conditions were discovered shortly after commencement of the job on June 4, 1951, and suggested the corrective action needed. It is to be noted that the plaintiff had entered into a contract to do specified work in a specified manner for which payment was to be made on a unit basis; that it commenced work on the project June 4, 1951; and that it was obligated under the terms of the contract to complete the construction work and accomplish the required results by October 15, 1951. Although there was state inspection from the beginning of the project and the state was notified almost immediately regarding the conditions between stations 31 and 46, no change order appears to have been executed on behalf of the state permitting plaintiff to take corrective action, as suggested, by installing perforated drainpipe in the subgrade and using gravel fill rather than a clay fill until order No. 9 was issued in September 1951. This order permitted plaintiff to lay only 800 feet of perforated pipe in the area where these compaction difficulties had been encountered. It was found that that was not sufficient. The compaction difficulties continued to exist in the balance of the area and yet no change order giving plaintiff permission to take similar corrective action throughout the remaining area was issued until May 12, 1952, as change order No. 11, permitting the installation of an additional 900 feet of perforated drainage pipe. The latter change order finally solved the matter so that the plaintiff could go on to a completion of the project.

While the plaintiff under the terms of the contract was required to complete the job by October 15, 1951, it appears that the completion time had to be extended to the month of June 1952. Because of the delay due to the unforeseen wet and plastic soil condition plaintiff was forced to carry over through the winter. It had to provide and spread gravel for winter protection, incur expenses for extra labor and extra use of equipment which could otherwise have been avoided. The construction work was not finally accepted by the state until May 2, 1953.

Plaintiff takes the position that the state, through the contract provisions and the methods and specifications prescribed, in effect represented and warranted it to that the subsoil under and adjacent to the proposed highways between stations 31 and 46 was capable of being compacted as specified and directed; that the soil material was stable and workable under the methods prescribed; and that it was free from excessive subsurface water. Plaintiff further contends that the plans and specifications as they applied to compacting soil materials were wholly inadequate and insufficient in that they failed to disclose the true condition of the soil materials in an area where the state's engineers had conducted in excess of 100 test-hole drillings over a distance approximating 10,000 lineal feet in October and November 1950; and in that they failed to recognize and disclose that subdrainage in the area would be required; and in that they failed to make suitable provisions therefor. In other words, it is plaintiff's contention that the plans and specifications prescribed construction methods unsuitable to the performance of the compacting work involved; that the plaintiff as contractor was restricted from applying any other methods; and that the state failed to take timely action even though it had been informed from the start through its engineers regarding the deficiencies in the plans and specifications.

It is undisputed that the state failed to cooperate with the plaintiff by taking prompt action which might very well have permitted it to complete the project in the fall of 1951. Had the plans and specifications permitted the plaintiff to operate according to the methods which the change orders later permitted, it would have been able to realize a reasonable and proper profit on the contract as its prior analysis of the

plans and inspection of the area had indicated would be possible. It is plaintiff's claim that, relying on the state's representations and warranties, it proceeded to make its bid in an amount sufficient to compensate it for the cost of construction as well as a reasonable and proper profit, to which the state concededly must have agreed it was entitled.[1]

---

[1]Plaintiff's testimony as to damages may be summarized as follows from the record:

| | | |
|---|---:|---:|
| Additional expenses for labor and material: | | |
| Claim No. 973 | $ 15,271.70 | |
| Claim No. 974 | 1,791.77 | |
| Claim No. 975 | 1,993.48 | |
| Claim No. 976 | 4,306.43 | |
| Claim No. 988 | 12,343.73 | |
| Subtotal (amount set forth in complaint) | | $ 35,707.11 |
| Claim No. 977 | 668.41 | |
| Claim No. 987 | 1,389.12 | |
| Subtotal (amount set forth in complaint as amended during the trial) | | 37,764.64 |
| Additional expenses for overhead: 20 percent of $91,932.61 (the total general overhead expenses on all operations and contracts performed during plaintiff's work year of 1952) | 18,386.52 | |
| Job overhead expenses during the work year 1952, actually incurred in the performance of this contract | 18,472.34 | |
| Total of the foregoing expenses, less a deduction of $40.00 | | 74,583.50 |
| 10 percent of the foregoing additional expenses as a reasonable allowance for profit | | 7,458.35 |
| Amount withheld by state as liquidated damages for failing to complete contract in time | | 5,492.59 |
| Interest computed at six percent per annum on $5,492.59 from May 2, 1953 | | 1,153.32 |
| Total damages claimed | | $ 88,687.76 |

Plaintiff therefore claims that it wholly failed to realize a reasonable or proper profit due to the representations contained in what proved to be insufficient plans and specifications to meet the conditions of the subsurface soil material in the area; that as a result plaintiff suffered consequential damages according to plaintiff's witnesses in the following respects: (a) Delays resulting from the difficulties upset the plaintiff's planned sequence of operations to the extent that the cost of performing other work was increased; (b) they had to pay wages to employees and rent on equipment during a period they could not pave certain areas; (c) they had to perform additional work; and (d) they could not complete the required work by the contract completion date of October 15, 1951.

Plaintiff also claims that had the plans and specifications been sufficient it would have been able to have realized a profit in the sum of $51,430.20, the original bid having been $514,301.95. Plaintiff insists that it should not bear the burden of the delays and the expenses attendant thereon caused by the presence of the unsatisfactory soil conditions in a situation where, due to the time limit for the preparation of its bid, it had to rely upon the terms of the contract and the plans and specifications, all of which had been prepared by the state.

The evidence indicates that the engineers and officials of the Highway Department were neither aware of nor fully informed as to the unusual soil conditions existing at the time the state advertised for bids even though numerous soil tests had been made in its behalf in the area preparatory to formulating its plans and specifications. The evidence indicates that there were occasional wet spots found in testing throughout the surrounding area other than stations 31 to 46, but that between 31 and 46 all tests but one indicated wet or moist soil and the deeper the application of the test the wetter the underlying soil. There is evidence that the frost boil found between stations 31 and 46 preexisted the contract and in fact went back to 1933. Since the state exercised complete control and it required compaction of the subsurface soil to a specified degree under the contract, it is the position of the plaintiff that the plans and specifications by implication warranted the presence of a type of soil suitable to the degree of compaction required by the contract.

The record indicates that for some months prior to the time the state made these soil tests the times were much drier than normal. The record also indicates that from November 1950 to March 1951 precipitation was above normal, the preceding year having been below normal. During the months of April and May 1951 precipitation rose slightly above normal. During one of the months in the summer of 1951, precipitation rose 4 inches above normal. There was no precipitation during the first 4 days following plaintiff's commencement of work on June 4, 1951. When plaintiff attempted the use of a dragline it sank into soft dirt and mud between stations 31 and 46 so that indications of unworkable subsoil in that area appeared immediately and at a time when there had been no rainfall for several days. Unavailing efforts at compaction were made and continued throughout the months of July and August 1951 over a period when rainfall was only slightly above normal and at a time when plaintiff had a large concentration of machinery available. Nevertheless, whatever the application of equipment, the soil could not be compacted even though plaintiff used many and various attempted combinations. While the state has urged that the difficulty which the plaintiff encountered in soil compaction was due to abnormal rainfall, the record does not disclose that this was in fact the underlying cause.

The jury after receiving the charge of the court resolved the disputed fact issues and concluded that the burden should be borne by the state as indicated by their return of a verdict for plaintiff in the amount of $57,810. Defendant moved for judgment notwithstanding the verdict or in the alternative for a new trial. The court below denied the motion, and the state appeals from that order; from the judgment entered; and from the order of the district court denying defendant's motion to strike part of plaintiff's amended complaint for its failure to state a claim upon which relief could be granted.

The state's assignment of errors presents the following contentions and issues for determination: (1) That the complaint seeking damages from the state for breach of an implied warranty fails to state a claim upon which relief can be granted when the jurisdiction conferred upon the court and the state's waiver of immunity from suit is limited to controversies arising out of contract; (2) that the evidence does not

justify the imposition of strict liability of a warranty on the grounds (a) that there was no express warranty or positive representation; (b) that there was no positive representation for a warranty implied in fact; (c) that there were no circumstances justifying imposition of a warranty implied by law; (d) that by the mere act of furnishing plans and specifications the owner does not warrant the sufficiency of the plans, that as a matter of law neither party warrants the sufficiency of the plans, that the contractor assumed the risks of performances, including the risk of defects in the soil and the risk of defects in the plans; (e) that the contract is subject to an implied condition; that risks of performance are assumed subject at most to a condition implied by law that performance is possible instead of a warranty implied by law that performance is possible; (f) that a mere contractual requirement cannot constitute a representation; (g) that the scope of the undertaking here as determined by the many provisions of both the original contract and the modified contract precludes the implication of a warranty; (3) that the court erred in receiving and in refusing to strike evidence of costs of compaction in areas outside of the area defined in the pleadings; that the court erred in receiving evidence of rental equipment under an allegation of additional expenses for labor and materials; (4) that the court erred in receiving remote and speculative evidence of overhead expense and loss of profits; (5) that the court erred in refusing to instruct the jury that plaintiff's recovery should be limited to: (a) Direct damages in the form of increased costs of compaction in the area in which a breach of warranty is found to have occurred, and (b) consequential damages or losses which were within the probable contemplation of the parties at the time of contracting and which indirectly resulted from and which were proximately caused by the breach of warranty; also that the court erred as to proper measure of damages; that the court erred in refusing to direct a verdict; and that the verdict was not justified by the evidence.

The plaintiff contends that there are essentially only three basic issues presented on this appeal and that the state's claims on this appeal are limited to the following: (1) That the jury's verdict on the soil condition and damage issues is not supported by the evidence; (2) that the trial court erred in its instruction on the existence of an implied war-

ranty; and (3) that the claim is barred entirely by the fiction of sovereign immunity. The plaintiff argues that aside from undisputed rules of law governing the scope of appellate review, the first issue is entirely a fact question and that the evidence relating to this fact question really comprises the greater part of the record on this appeal numbering 1028 pages; that the size and length of the record is on its face a prima facie refutation of the state's claim that the jury verdict is based upon insufficient evidence; that the record is replete with competent documentary evidence and expert opinion which furnishes sufficient and satisfactory support on the many technical fact issues herein submitted; and that the various contentions reflected in the testimony as a whole and the many conflicts in the testimony are matters for jury determination and furnish no grounds for overturning the verdict. Plaintiff further contends that the remaining issues on this appeal are primarily questions of law presented on undisputed facts and must be resolved as such under applicable rules of law.

■   Where the jury's verdict involves disputed fact questions, we are bound to consider the evidence in the light most favorable to the verdict, and the verdict will be sustained if it is possible to do so on any reasonable theory of the evidence. This means that the appellate court in reviewing the record is obliged to give the verdict the benefit of every reasonable inference which may properly be drawn to its support from the evidence as a whole. Therefore, unless the jury's verdict is manifestly and palpably contrary to the evidence, it should not be set aside. See, 1 Dunnell, Dig. (3 ed.) § 415.

The state's contention that the plaintiff's complaint fails to state a claim upon which relief can be granted under M. S. A. 161.03, subd. 17, has no support in the record. That statute provides:

"When a controversy arises out of any contract for the construction or repair of state trunk highways entered into by the commissioner of highways or by his authority, in respect to which controversy the party would be entitled to redress against the state, either in a court of law or equity, if the state were suable, where no claim against the state has heretofore been made under Mason's Minnesota Statutes of 1927, Section 2554, Subsection 17, the state hereby waives immunity from

suit in connection with such controversy and hereby confers jurisdiction on the district courts of the state to hear and try out such controversy in the manner provided for the trial of causes in the district courts."

■ It is argued on behalf of the state that the plaintiff has brought a complaint sounding in tort and has resorted to a legal fiction in order to turn an action ex delicto into an action ex contractu; that there is no controversy arising out of the contract between the parties to the action and that therefore the court has not acquired jurisdiction over the state to impose strict liability for a warranty implied by law.

That a controversy exists is undisputed. It is also undisputed that the State of Minnesota has not waived its immunity as to torts. The important question, then, is whether or not the controversy arises out of a contract. It is clear that the action in the instant case is not maintainable without pleading and proving the contract, and since the gist of the action is the breach of the contract, it is in substance, whatever may be the form of the pleading, an action on the contract. It is apparent that the state relies on what the plaintiff calls an abandoned "theory of pleadings" to show that this is a tort action. See, Siats v. Western Union Tel. Co. 251 Minn. 412, 88 N. W. (2d) 199; 1 Pirsig, Minn. Pleading (4 ed.) § 109. Except for the highway construction contract with its plans and specifications attached, entered into between the plaintiff and the state, the plaintiff would have no claim against the state. We think the test applied in Whittaker v. Collins, 34 Minn. 299, 25 N. W. 632, amply sustains plaintiff's contention that this is an action on the contract and that the case at bar falls directly within the rules enunciated by Mr. Justice Mitchell in that case and clearly controls the immunity question here. The basis for the present action is the alleged breach by the state of the contract, growing out of the representations it made therein. City of East Grand Forks v. Steele, 121 Minn. 296, 141 N. W. 181, 45 L.R.A. (N.S.) 205. It is to be noted that there has been no allegation of intentional fraud, deceit, or negligence involved in the instant action. See, Annotation, 1 A. L. R. (2d) 864, 865. This is not a case of waiving the tort and suing in assumpsit to get jurisdiction. It is a case based primarily on contract and it comes directly within the ruling of the United States Supreme Court in Keifer & Keifer v.

Reconstruction Finance Corp. 306 U. S. 381, 395, 59 S. Ct. 516, 521, 83 L. ed. 784, 792, wherein the court said:

"* * * To be sure, the common law fiction of waiving the tort and suing in assumpsit cannot be used as an evasion of the limited liability created by the Court of Claims Acts. * * * But where the wrong really derives from an undertaking, to stand on the undertaking and to disregard the tort is not to invoke a fictive agreement. It merely recognizes a choice of procedural vindications open to the injured party."

Also see, Barthelemy v. Foley Elev. Co. 141 Minn. 423, 170 N. W. 513; Christie v. United States, 237 U. S. 234, 35 S. Ct. 565, 59 L. ed. 933.

A leading case on waiver of immunity is Hersey Gravel Co. v. State Highway Dept. 305 Mich. 333, 9 N. W. (2d) 567, 173 A. L. R. 302. In that case there was a claim for breach of representations and implied warranties as to subsoil conditions. The state contended that the lower court erred in allowing recovery because the pleadings and proof sounded in tort and therefore caused the action to be barred by sovereign immunity. The Michigan court said (305 Mich. 339, 9 N. W. [2d] 569):

"* * * It does not necessarily follow that, because plaintiff sought to recover damages resulting from a misrepresentation of subsoil conditions, that its claim is in tort. Plaintiff did not know, when it made its bid, that the material to be excavated was different from that described on the plans; and, although the facts developed at the trial might have justified a tort action, the claim may still properly be for damages for breach of the contract."

In a later Michigan case, W. H. Knapp Co. v. State Highway Dept. 311 Mich. 186, 18 N. W. (2d) 421, plaintiff, the successful bidder on a highway grading and drainage contract, sued for damages when additional costs were incurred on the job, claiming that it had been misled by representations as to the nature of the soil conditions which were other than that represented on the plans. Judgment was affirmed, the Michigan court stating (311 Mich. 188, 18 N. W. [2d] 421):

"Plaintiff does not count on tort, hence the doctrine of sovereign

immunity does not bar its claim. * * * Plaintiff does not seek to void the contract but claims additional sums because of difficulties in excavation greater than those indicated in the specifications."

The state has cited Dworsky v. Vermes Credit Jewelry, Inc. 244 Minn. 62, 69 N. W. (2d) 118, and Bekkevold v. Potts, 173 Minn. 87, 216 N. W. 790, 59 A. L. R. 1164, as authority for the abstract proposition that warranties implied in contravention of the actual intention of the party do not make a true contract and thus that this action is therefore a tort action and that the trial court did not have jurisdiction. We reach the conclusion that the Dworsky and Bekkevold cases are not in point and that plaintiff's claim herein may properly be made for damages for breach of the contract and that the state is not entitled to assert immunity in the case at bar.

■ The state contends that the court erred in its charge to the jury wherein it said:

"The Court in the exercise of its function of determining what the law is rules, as a matter of law, that the defendant, the State of Minnesota, in including in the plans and specifications a requirement that the embankment between Stations 31 and 46 be impacted to a specified density impliedly warranted that the condition of the subsoil upon which the embankment material was to be placed was at the time the State advertised for bids such that the embankment material could be compacted to the specified density if the contractor complied with the plans and specifications as to the manner of doing the work."

In reading the court's charge, it will be observed that the court followed the aforesaid instruction by a full and complete statement as to the rights, duties, and obligations of the parties to the contract and concluded that portion of its instructions by stating: *"The burden rests upon the plaintiff to prove by a fair preponderance of the evidence that there was in fact a breach of the implied warranty as to the condition of the subsoil at the time of the advertisement for bids."* (Italics supplied.) The court also stated in the course of its instructions that the instant action, being one for damages for an alleged breach of warranty, would not in any way be affected by the fact that the contract price had been paid to the plaintiff.

The general rules of law applicable to facts similar to those in the case at bar have been clearly stated by Mr. Justice Brandeis in United States v. Spearin, 248 U. S. 132, 136, 39 S. Ct. 59, 61, 63 L. ed. 166, 169, as follows:

"* * * Where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered. Day v. United States, 245 U. S. 159; Phoenix Bridge Co. v. United States, 211 U. S. 188. Thus one who undertakes to erect a structure upon a particular site, assumes ordinarily the risk of subsidence of the soil. Simpson v. United States, 172 U. S. 372; Dermott v. Jones, 2 Wall. 1. But if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications. MacKnight Flintic Stone Co. v. The Mayor, 160 N. Y. 72; Filbert v. Philadelphia, 181 Pa. St. 530; Bentley v. State, 73 Wisconsin, 416. See Sundstrom v. New York, 213 N. Y. 68. This responsibility of the owner is not overcome by the usual clauses requiring builders to visit the site, to check the plans, and to inform themselves of the requirements of the work, as is shown by Christie v. United States, 237 U. S. 234; Hollerbach v. United States, 233 U. S. 165, and United States v. Utah &c. Stage Co., 199 U. S. 414, 424, where it was held that the contractor should be relieved, if he was misled by erroneous statements in the specifications."

This court has stated the applicable rule and exception in Friederick v. County of Redwood, 153 Minn. 450, 451, 190 N. W. 801, 802, as follows:

"Where a contractor makes an absolute and unqualified contract to construct a building or perform a given undertaking, it is the general, and perhaps universal, rule that he assumes the risks attending the performance of the contract, and must repair and make good any injury or defect which occurs or develops before the completed work has been delivered to the other party. But where he makes a contract to perform a given undertaking in accordance with prescribed plans and specifications, this rule does not apply. Under such a contract he is not

permitted to vary from the prescribed plans and specifications even if he deems them improper and insufficient; and therefore cannot be held to guarantee that work performed as required by them will be free from defects, or withstand the action of the elements, or accomplish the purpose intended. Where the contract specifies what he is to do and the manner and method of doing it, and he does the work specified in the manner specified, his engagement is fulfilled, and he remains liable only for defects resulting from improper workmanship or other fault on his part, unless there be a provision in the contract imposing some other or further obligation."

In MacKnight Flintic Stone Co. v. The Mayor, 160 N. Y. 72, 83, 54 N. E. 661, 664, the court said:

"This is not the case of an independent workman, left to adopt his own method, but of one bound hand and foot to the plan of the defendant. The plaintiff had no right to alter the specifications, although the defendant had a qualified right to do so. If the plan and specifications were defective it was not the fault of the plaintiff, but of the defendant, for it caused them to be made and it alone had the power to alter them. It relied upon its own judgment in adopting them, not upon the judgment of the plaintiff. * * * If there was an implied warranty of sufficiency, it was made by the party who prepared the plan and specifications, because they were its work, and in calling for proposals to produce a specified result by following them, it may fairly be said to have warranted them adequate to produce that result. If I agree to produce a certain result according to my own plan, I impliedly warrant its sufficiency; but if I agree to produce that result by strictly following the plan prepared by another party, he impliedly warrants its sufficiency. The responsibility rests upon the party who fathers the plan and presents it to the other with the implied representation that it is adequate for the purpose to be accomplished. A stipulation requiring a contractor to produce a certain result by following the plan and directions of the owner is an undertaking that it can be done in that way. * * * to use the language of a learned court in an analogous case, 'It would certainly be regarded as most extraordinary to find that a contractor had undertaken to warrant the perfection of a plan which is designed by the

person for whom he is to do the work, or the wisdom of directions given during the progress of the work by one whom he cannot control, but whose orders in the execution of the work he is, by the terms of the contract, bound to obey.' (MacRitchie v. City of Lake View, 30 Ill. App. 393, 398.)"

■ It seems to be quite clear that, in contracting cases, one of the main reasons assigned for supporting an implied warranty based upon the plan is the control exercised by the owner in furnishing the plan and directing details of the work. Friederick v. County of Redwood, *supra;* Bentley v. State, 73 Wis. 416, 41 N. W. 338.[2]

■ It is generally held and this by the great weight of authority that the act of the owner in furnishing the plans and specifications amounts to a warranty of their fitness and that, where one party furnishes specifications and plans for a contractor to follow in a construction job, he thereby impliedly warrants their sufficiency for the purposes implicit therein and whether the builder has been damaged in proceeding with the work in reliance on such an implied warranty or whether he was damaged in relying on the warranty in making his bid, he may recover.[3]

The implied warranty of fitness has had recognition in Minnesota in Goulds v. Brophy, 42 Minn. 109, 43 N. W. 834, 6 L. R. A. 392, and Breen v. Moran, 51 Minn. 525, 53 N. W. 755. Our court has attached considerable importance to the kind of exclusive control admittedly exercised by the state in the case at bar, placing the risks of loss on the party in control. See, Siebert v. Leonard, 17 Minn. 410 (433); Breen

---

[2]Suffice it to say that the Friederick case has been cited as authority in L. W. Kinnear, Inc. v. City of Lincoln Park, 260 Mich. 250, 244 N. W. 463; State v. Commercial Cas. Ins. Co. 125 Neb. 43, 248 N. W. 807, 88 A. L. R. 790; 6 Williston, Contracts (Rev. ed.) § 1966.

[3]Hammaker v. Schleigh, 157 Md. 652, 147 A. 790, 65 A. L. R. 1285; Faber v. City of New York, 222 N. Y. 255, 118 N. E. 609; Bentley v. State, 73 Wis. 416, 41 N. W. 338; United States v. Spearin, 248 U. S. 132, 39 S. Ct. 59, 63 L. ed. 166; Penn Bridge Co. v. City of New Orleans (5 Cir.) 222 F. 737, certiorari denied, 239 U. S. 639, 36 S. Ct. 160, 60 L. ed. 481; Passaic Valley Sewerage Commrs. v. Tierney (3 Cir.) 1 F. (2d) 304; Montrose Contracting Co. v. County of Westchester (2 Cir.) 80 F. (2d) 841.

v. Cameron, 132 Minn. 357, 157 N. W. 500; O'Dea v. City of Winona, 41 Minn. 424, 43 N. W. 97.

In Stanton v. Morris Const. Co. 159 Minn. 380, 199 N. W. 104, this court clearly confirmed the proposition: (1) That a builder may rely on plans and specifications furnished by the owners, and (2) that builders may rely on plans and specifications furnished by the owner even where the contract contains a cautionary notice stating that the owner does not assume responsibility for discrepancies in the plans and specifications. It is not to be overlooked that in the instant case the contractor was given no right to take corrective action, even though the plans and specifications proved inadequate for completion of the work, until such authority belatedly came from the state.[4]

Cases illustrating the situation in which the plans contain representations that certain specified conditions exist are to be found in City of

---

[4]The decision in Stanton v. Morris Const. Co. 159 Minn. 380, 199 N. W. 104, finds support in the following cases: United States v. Spearin, *supra;* Passaic Valley Sewerage Commrs. v. Tierney, *supra;* Arcole Midwest Corp. v. United States (Ct. Cl.) 113 F. Supp. 278; United States v. Smith, 256 U. S. 11, 41 S. Ct. 413, 65 L. ed. 808; Hollerbach v. United States, 233 U. S. 165, 34 S. Ct. 553, 58 L. ed. 898; Cauldwell-Wingate Co. v. State, 276 N. Y. 365, 12 N. E. (2d) 443; United States v. Atlantic Dredging Co. 253 U. S. 1, 40 S. Ct. 423, 64 L. ed. 735; Davis v. Commrs. of Sewerage (W. D. Ky.) 13 F. Supp. 672.

In 21 Minn. L. Rev. 70, 74, the authority supporting implied warranty of plans and specifications has been analyzed as follows:

"Warranties derived from the furnishing of plans and specifications may be divided into three classes according to the nature of the representation involved: First, the act of furnishing the plans may amount to a representation that they are theoretically practicable for the purpose intended; second, the same act may be a representation that physical conditions appropriate to the carrying out of the plans exist; and third, the plans may often contain a representation that certain specified conditions exist. In the first two instances the representation is not expressed but must be implied from the owner's act, while in the third class there is a direct representation by words or symbols. In all three cases, however, the important problem is not to discover the representation, but rather to determine the reasonableness of the builder's reliance thereon."

Lima v. Farley (6 Cir.) 7 F. (2d) 40, and other similar cases.[5]

■ The evidence in the case at bar, viewed as a whole, demonstrates that the owner's actions in furnishing detailed plans and specifications controlled not only the particular result to be accomplished but also the particular construction methods to be followed and used and supports an implied warranty in keeping with the intention and expectation of the parties that the plans, specifications, and soil conditions were such as would permit successful conclusion of the work. The state was the party in control who dictated the entire contract and retained control from start to finish. The evidence reasonably indicates that the plaintiff had neither the time nor the information prior to becoming a bidder nor the right of control in planning or executing the work which under the contract and the plans and specifications rested with the state. We think it may reasonably be said that in the instant case the party who had the superior knowledge and the complete control was the state.

■ Another contention of the state is to the effect that the trial court erred in refusing to give the requested instructions of defendant as to the measure of damages. The court instructed the jury as to the measure of damages in the following language:

"* * * if you find that the plaintiff is entitled to recover you should award to it an amount sufficient to compensate it for the damages which naturally flowed from the breach of warranty. Where there has been a breach of warranty it is the purpose of the law to compensate a person entitled to recover for the damages actually sustained by him as a natural consequence of the breach of warranty. Specifically as applied to this case the amount of the damages to be awarded should be an amount equal to the difference between the fair and reasonable cost of performing the work of the entire contract if the conditions had been as warranted, and the fair and reasonable cost of performing the contract under the conditions which you actually find to have existed and were not as warranted. It is proper for you to consider not only the actual cost of the labor and material, but also other items of claimed damage,

---

[5]United States v. Atlantic Dredging Co. *supra;* United States v. Smith, *supra;* Hollerbach v. United States, *supra;* Faber v. City of New York, *supra;* W. H. Knapp Co. v. State Highway Dept. 311 Mich. 186, 18 N. W. (2d) 421.

such as increased overhead, damage caused by the delay incident to the breach of warranty, if any, and any other matters which you find from the preponderance of the evidence naturally flowed from the breach, and in considering this, again you should bear in mind that it was the obligation and duty of the plaintiff here, when it discovered the breach of warranty, to use reasonable precautions and reasonable care to minimize the damage or hold down the loss and damage. Of course the contractor could not depart from the plans and specifications and try to do the work in a manner not contemplated by the plans and specifications.

"* * * *the plaintiff is limited in its recovery to such damages as were the natural consequence of the breach of warranty. It would not be entitled to recover for damages or losses which may have resulted from other causes." (Italics supplied.)

It is to be noted in the instant case that we are not considering a negotiated contract. The contract here involved was prepared in its entirety by the state and was submitted to the bidders without opportunity for negotiation as to terms, without right to change any of its specific details, and without right to deviate either in the results to be accomplished or the means to be used in the accomplishment of the results sought by the state. The state in its preparation made the soil tests applying the knowledge of its own engineering experts over a 6-month period of investigation and preparation, and it was possessed of the records that related to prior highway work in this proposed area of improvement. The plaintiff had a total of approximately 15 days between its first notice of advertisement of bids to the date of submitting bids to do everything necessary for the preparation and submission of a bid.[6]

The state claims that the court was in error in permitting reasonable value of rental equipment to be proved under an allegation of labor and materials. This statement is made without the citation of cases to

---

[6]As to whether or not bidders are entitled to rely upon the sufficiency of what the owner has furnished in the way of plans and specifications, see Stanton v. Morris Const. Co. 159 Minn. 380, 199 N. W. 104; Faber v. City of New York, *supra;* W. H. Knapp Co. v. State Highway Dept. *supra.*

support it. There are numerous cases in the books, however, holding that rental of equipment is included in the term "labor and materials."[7]

We reach the conclusion that the court's instructions on "implied warranty" and on the measure of damages, to both of which the state has taken exception, were substantially correct as to the rules of law applicable to the facts herein. It appears to us that the court instructed fully and sufficiently on both issues. We fail to recognize any prejudicial error. While special requests for instructions were submitted by the state, largely consisting of special propositions, we think the state's requests were given in substance, so far as applicable to the conflicts in the evidence and the disputed fact issues submitted for the jury's determination. The trial court is not required to give requested instructions verbatim but may do so in substance, free from the technical language of the law. Kostuch v. St. Paul City Ry. Co. 78 Minn. 459, 81 N. W. 215; Mason's Dunnell, Minn. Practice, § 1523.

■ The plaintiff detailed proof of damages in the total amount of $88,687.76. As indicated by the cases, it is not always possible to compute the amount with mathematical exactness, but after careful consideration of the entire record in the instant case, we have concluded that the above figures come as near being correct as it is possible to arrive at from the proof. The evidence submitted on both sides on the issue of damages is admittedly voluminous. Plaintiff claims considerably more in its pleadings than the detailed proof in the record discloses, and the state, based upon a long list of errors, says it should be much less than the detailed proof indicates; but its reduction does not amount to more than approximately $15,000. The jury verdict of $57,810 indicated a reduction in the amount detailed by the proof of $30,877.76. The state's claimed errors come far short of amounting to anywhere near the sum in which the jury reduced plaintiff's detailed proof of damages. In that regard, if the state were to be given the benefit of every inference in its favor, which it can hardly claim as a

[7]Illinois Surety Co. v. John Davis Co. 244 U. S. 376, 37 S. Ct. 614, 61 L. ed. 1206; Continental Cas. Co. v. Clarence L. Boyd Co. (10 Cir.) 140 F. (2d) 115; United States v. D. L. Taylor Co. (E. D. N. C.) 268 F. 635; United States v. Ambursen Dam Co. (N. D. Cal.) 3 F. Supp. 548; Dawson v. Northwestern Const. Co. 137 Minn. 352, 163 N. W. 772.

right in assailing the amount of a jury verdict, and if additionally its legal position were entirely conceded in that regard, it has still failed to demonstrate that plaintiff's damages should be further reduced. It is our view that the record discloses ample evidence to support the amount of the jury award.

The state has contended that if any damages were suffered on the part of the plaintiff they would under the contract plans and specifications be limited to the area between stations 31 and 46 of the construction project. The jury could find from the evidence as a whole that the soil conditions proved impossible of solution for compaction purposes until corrective measures were finally taken which plaintiff had urged shortly after commencing work on the job on June 4, 1951. Argument cannot overcome the facts which appear clearly from the evidence, that there had been undue delay in connection with the state's issuance of change orders Nos. 9 and 11 which had prevented the plaintiff from completing the compaction work as well as the other construction work under the contract in the fall of 1951. In fact admissions appear in the record on the part of the state's own witnesses that the subgrade soil at the work site was so unstable that it was impossible to obtain compaction. We think, therefore, if a contractor encounters, as did the plaintiff in the instant case, an area where he cannot get compaction and the state will not take prompt action to permit corrective measures suggested by the contractor, the natural result must follow that the entire plan of operation is disturbed and to a large extent completely disrupted with consequential delay resulting in increased expense to the contractor. Plaintiff claims that the job costs increased throughout and for the entire portion of the construction work because his whole laid-out plan of operation had been disrupted; that the stalemate caused between stations 31 and 46 increased operation costs throughout the entire area of construction; and that therefore the plaintiff was not limited to one space or single area, but was clearly within his rights, in including as a part of his proof of damages additional expenses incurred in use of equipment, labor, and other items while operating on the job in question. Plaintiff entered into and operated under one contract which included one set of plans and specifications. Stations 31 and 46 comprise only a part of the whole job to be completed by October 15,

1951. We do not find support in the record for the state's argument that damages awarded the plaintiff must be limited to the increased cost of compaction between stations 31 and 46. It seems to us that the evidence sustains the view adopted by the trial court that plaintiff's damages were the increased cost resulting from the impossibility of achieving adequate compaction by the restricted methods contained in the state's plans and specifications. The fact that the plaintiff may have proven as one item the increased compaction expenses between stations 31 and 46 did not necessarily constitute an election on its part as to the method of proving its damages which would estop it from proving any and all damages which resulted directly from one specific cause, namely, the soil conditions encountered between stations 31 and 46. The court in its instructions admonished the jury that the plaintiff would be limited in its recovery to such damages as were the natural consequence of the breach of warranty and that plaintiff would not be entitled to recover for damages or losses which may have resulted from other causes.

■ Suffice it to say, however, that the state has conceded that the court's instructions on the measure of damages are correct as a general proposition, only contending here that the measure of the recovery stated by the court is not applicable to the facts, the conflicts in the evidence and to the disputed fact issues of this case; and particularly so it says, in view of the court's rulings on the reception of evidence, the refusal to strike certain evidence, the refusal to correct the error by directing a verdict, and the instruction that "mere difficulty in assessing damages is not a reason for denying damages to a party who is entitled to damages." In view of the state's concession on the aforesaid issue and based upon a careful review of the evidence as applied to damages, we find no prejudicial error either in the reception of the evidence or in the instruction with reference to difficulty in assessing damages.

■ We finally reach the conclusion that the trial court did not err in denying defendant's motion to strike paragraphs 6, 7, 8, and 9 and part of paragraph 4 of plaintiff's amended complaint; nor in its denial of defendant's motion to strike all of plaintiff's testimony relating to costs of compaction; nor in the reception of evidence as to plaintiff's

damages, and this especially in view of the court's full and complete instructions on that issue; nor in refusing to grant defendant's motion for a directed verdict at the close of the evidence on any of the grounds upon which it was urged.

We think the jury verdict has ample support from evidence wholly within the issues of the pleadings and that it must be affirmed.

Affirmed.