**LAYNE–MINNESOTA p. r., INC., Appellee,**

v.

**The SINGER COMPANY and Layne-Atlantic Company, Appellants,**

v.

**LAYNE–MINNESOTA COMPANY and United Pacific Insurance Company, Appellees.**

Nos. 77–1731, 77–1786.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 14, 1978.

Decided April 19, 1978.

Elmer B. Trousdale, St. Paul, Minn., for appellant, David C. Donnelly, St. Paul, Minn., on briefs; Oppenheimer, Wolff, Foster, Shepard & Donnelly, St. Paul, Minn., filed appendix.

B. Warren Hart, St. Paul, Minn., for appellee; A. Patrick Leighton, St. Paul, Minn., on brief.

Before HEANEY and STEPHENSON, Circuit Judges, and BECKER, Senior District Judge.*

HEANEY, Circuit Judge.

In 1971, Layne-Atlantic Company, a wholly owned subsidiary of The Singer Company, entered into a construction contract with Layne-Minnesota Company.[1] Layne-Minnesota agreed to drill caisson holes for two bridge sites, Overlook and LaPalmas, in connection with a Puerto Rican highway construction project. Layne-Atlantic had previously contracted with Ballenger-Potashnick, the general contractor for the project, to drill the holes. The drilling was considerably more difficult than anticipated and took longer to complete than estimated. The cost exceeded the original estimate by $354,549.73. The task took twenty-four months to complete rather than the eight months originally estimated. Layne-Minnesota brought suit against Layne-Atlantic and Singer in the United States District Court for the District of Minnesota to recover its costs, overhead and profits.

Shortly after this action was filed, Layne-Atlantic and Singer brought an action in the United States District Court for the District of Puerto Rico against Ballenger-Potashnick and the Puerto Rican Highway Authority for damages resulting from extra work on the drilling project. Layne-Atlantic and Singer then moved the Minnesota District Court to transfer this action to Puerto Rico pursuant to 28 U.S.C. § 1404(a). The motion was denied. Motions were also made to dismiss the action for failure to join indispensable parties, Fed.R.Civ.P. 19(b), and for failure to obtain personal jurisdiction over Layne-Atlantic. These motions were denied. After a nonjury trial, the trial court awarded Layne-Minnesota damages of $352,795.20, plus interest of six percent per annum from October 12, 1973. It allowed Layne-Atlantic's counterclaims in the amounts of $23,872 and $47,521.75 which were treated as offsets to Layne-Minnesota's damages. The net amount of the recovery was $281,401.45.

*I*

Layne-Atlantic argues initially that several factual findings are clearly erroneous. In particular, it argues that the trial court erred in finding that the "sound rock," re-

---

* The Honorable William H. Becker, Senior District Judge, Western District of Missouri, sitting by designation.

1. Layne-Minnesota subsequently assigned its rights to its wholly owned subsidiary, Layne-Minnesota p.r., Inc., the plaintiff-appellee in this action. Layne-Atlantic and Singer joined Layne-Minnesota, the parent, as a third-party defendant. The trial court did not err in dismissing the third-party claim. Layne-Atlantic did not allege that Layne-Minnesota would be liable to Layne-Atlantic for all or part of Layne-Minnesota p.r., Inc.'s, claim against Layne-Atlantic. *See* Fed.R.Civ.P. 14(a). For convenience, we refer to the plaintiff-appellee as Layne-Minnesota throughout the opinion.

ferred to in the drilling specifications, did not include the "hard rock" encountered at the drilling site; that the specifications stated the rock could be drilled by using rotary tricone bits; and that the negotiations established an open-ended rather than a results contract.

We will accept the factual findings of a trial court unless they are clearly erroneous. *See, e. g., Swanson & Youngdale, Inc. v. Seagrave Corp.,* 561 F.2d 171 (8th Cir. 1977); Fed.R.Civ.P. 52(a). A finding of fact is clearly erroneous if, upon review of the entire record, the reviewing court forms "the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *Ridgway v. United Hospitals-Miller Division,* 563 F.2d 923, 927 (8th Cir. 1977). We have carefully reviewed the entire record and conclude that the findings of the trial court were not clearly erroneous.

The evidence shows that in early June, 1971, Robert Peters, a vice-president of Layne-Atlantic and a vice-president and regional manager for Singer, contacted Donald Vry, the president of Layne-Minnesota. Peters asked Vry if Layne-Minnesota would be interested in the Puerto Rican drilling project. He represented that the drilling could be accomplished by utilizing auger-type drilling equipment. Vry discussed the proposition with Warren Lindeke, a vice-president of Layne-Minnesota, and the two expressed an interest in the project. Vry and Lindeke later met with Peters and Dick Bendetto, who was with the Water Resources Division of Singer. Peters and Bendetto again represented that an auger-type drilling arrangement was required.

Later in June, Lindeke traveled to Puerto Rico to obtain soil samples from the project area. He met with Peters, Bendetto and another representative from Singer. Soil samples were not available from the project area as the area was inaccessible. However, samples were inspected from a proximate area. Peters represented to Lindeke that the samples would be the most difficult material drilled. The samples indicated that the rock could be drilled with auger-type drilling equipment.[2]

During the ensuing negotiations, Peters stated that he wanted a contract price based on the number of feet drilled rather than a rate for equipment rental or a cost-plus contract. Negotiations continued during the summer; and on August 17, 1971, Peters sent a proposed subcontract to Vry. Attached to the subcontract were technical specifications for the drilling at the two bridge sites. The specification for the La-Palmas site provided that "the holes shall be drilled using rotary tricone bits capable of drilling sound rock." Rotary tricone bits are an auger-type drilling device.

Vry agreed to the subcontract on August 30, 1971, with certain modifications. It is clear, from Vry's transmittal letter to Peters, that Layne-Minnesota was depending on the representations of Layne-Atlantic for information about the drill site:

> It was assumed and understood through conversation that the bulk of drilling would be in overburden and weathered rock. Our operation was geared to drilling in this type material with provisions made to cut solid or unweathered rock if that situation presented itself on occasion. Since boring information has not been available at the drill site locations, there still exists a question about the amount of rock drilling involved, and we must keep this item open.

These representations were reflected in the contract price which was a "shotgun figure" per lineal foot of hole:

> In the absence of any detailed plans, specifications and soil borings, some assumptions were necessarily made, and our estimating was done with this information as a basis.

---

**2.** Lindeke and Peters picked out samples of weathered andesite breccia for testing purposes. The test results indicated that the samples had a resistance to drilling similar to a high quality limestone.

The letter also states that Layne-Minnesota refused to accept responsibility for conditions not outlined in the drilling specifications and that "[s]hould field conditions vary greatly from those anticipated, it may be necessary to modify the contract accordingly." Peters agreed to these changes. The estimated cost of the drilling contract was $264,900.

During this same period, Peters also negotiated with Ballenger-Potashnick. On August 2, 1971, Layne-Atlantic entered into a contract with Ballenger-Potashnick to drill the holes for $781,836.[3]

Men and equipment from Layne-Minnesota were transported to Puerto Rico and work on the project began in October, 1971. Layne-Minnesota attempted to utilize the auger-type, rotary tricone bits called for in the specifications but they were virtually useless. A few months after the drilling started, the bits were almost completely destroyed. Several alternative drilling methods and devices were used after the rotary tricone bits failed. A percussion-type drilling rig was finally used, but Layne-Minnesota never could drill rock at a practical production rate. The drilling conditions caused considerable damage to the equipment and frequent breakdowns. The equipment required continuous maintenance which was not needed on a normal project.

Lindeke stated that the rock actually encountered at the drilling site was much harder than the hardest sample of rock Layne-Atlantic represented as typical. He further stated that he had never experienced such difficult drilling or such hard rock. Layne-Minnesota's field superintendent in Puerto Rico and Peters also testified that they had never seen such difficult drilling.

The evidence shows that Layne-Minnesota depended on Layne-Atlantic and the drilling specifications for information about the condition of the drilling site and the equipment needed. Layne-Minnesota protected itself by open-ending the contract if drilling and site conditions were not as assumed. The evidence establishes that the "hard rock" at the drilling site was unlike any contemplated by the parties.[4]

*II*

Layne-Atlantic also argues that the trial court erred when it refused to transfer this action to Puerto Rico and to dismiss the case for failure to join an indispensable party. Both contentions assume that the issues in this action are identical to those issues in the Puerto Rican action. This assumption is incorrect.

Layne-Minnesota did not have any contractual relationship with Ballenger-Potashnick or the Puerto Rican Highway Authority, although Layne-Minnesota's contract with Layne-Atlantic encompassed the same drilling project as Layne-Atlantic's contract with Ballenger-Potashnick. Moreover, the terms of the two contracts are substantially different with respect to obligations. Layne-Minnesota's contract provides that the contract price would be adjusted if final conditions differed from those originally specified. Layne-Atlantic's contract, however, contains no such limitation. Instead, Layne-Atlantic expressly assumed full responsibility for all conditions of work known and unknown.

---

**3.** Layne-Atlantic argues that Layne-Minnesota should be estopped from claiming that the contract is open-ended because it relied on early price quotations from Layne-Minnesota in entering into the fixed-price contract with Ballenger-Potashnick. The trial court found that Layne-Atlantic did not rely on these estimates but built into the contract protection against the work costing more than originally anticipated. As Layne-Atlantic's contract price was almost three times as great as their expected cost, this finding is not clearly erroneous.

**4.** Layne-Atlantic also contends that no evidence supports the finding that Layne-Atlantic acted as Singer's "agent." The finding is not clearly erroneous. Many employees of Layne-Atlantic, including Peters, were also employees of Singer. Representatives of Singer were present at all significant steps in the negotiations. In correspondence with Layne-Minnesota, letters were signed on behalf of "Singer Layne-Atlantic Company." Peters testified that Singer and Layne-Atlantic "were kind of all one and the same."

More importantly, there is no evidence that Ballenger-Potashnick made any representations to Layne-Minnesota similar to those made by Layne-Atlantic. Layne-Atlantic throughout the negotiations represented that the rock could be drilled using auger-type drilling equipment. The rock samples Layne-Atlantic gave to Layne-Minnesota for testing supported this representation.

■ A motion for transfer under 28 U.S.C. § 1404(a) is addressed to the discretion of the trial court and its actions will not be disturbed on appeal unless there has been an abuse of discretion. *United States v. Ponder*, 475 F.2d 37, 38 (5th Cir. 1973); *Wm. A. Smith Contract. Co., Inc. v. Travelers Indem. Co.*, 467 F.2d 662, 664 (10th Cir. 1972); *cf. Toro Co. v. Alsop*, 565 F.2d 998 (8th Cir. 1977). We find no abuse of discretion given the different issues involved in the two actions.

■ Layne-Atlantic asserts that it may be subject to inconsistent results since it was held liable in this action but it may lose on its claims in the Puerto Rican action. This is possible, but Layne-Atlantic will not be prejudiced in a way contemplated by Fed.R.Civ.P. 19(b). Any inconsistent results stem from the differing obligations under the two contracts rather than the inability to join Ballenger-Potashnick and the Puerto Rican Highway Authority in this action. *See Helzberg's, etc. v. Valley West Des Moines, etc.*, 564 F.2d 816, 819 (8th Cir. 1977).[5]

### III

■ Layne-Atlantic's remaining arguments concern the trial court's calculation of damages. The trial court used the "total cost" method of computing damages. This is an appropriate method given the difficulty in determining the damages proximately caused by Layne-Atlantic's breach of contract. *See Wunderlich Contracting Compa-*

ny v. United States*, 240 F.2d 201 (10th Cir.), *cert. denied*, 353 U.S. 950, 77 S.Ct. 861, 1 L.Ed.2d 859 (1957); *McCree & Company v. State*, 253 Minn. 295, 91 N.W.2d 713 (1958). Thus, Layne-Minnesota was entitled to the reasonable value of the work done including actual costs, overhead and profits. *See Hensel Phelps Const. Co. v. United States*, 413 F.2d 701, 704 (10th Cir. 1969); *Wunderlich Contracting Company v. United States, supra; McCree & Company v. State, supra.*

■ Layne-Atlantic argues that the trial court should not have used A.G.C. equipment rates in determining Layne-Minnesota's equipment costs. Equipment ownership rates published by the Associated General Contractors of America, Inc., generally known as A.G.C. rates, reflect the average expense to a contractor of owning and operating his equipment. The courts have accepted A.G.C. rates as the reasonable cost of ownership absent actual costs obtained from the contractor's records. *Bennett v. United States*, 371 F.2d 859, 862, 178 Ct.Cl. 61 (1967); *L. L. Hall Construction Company v. United States*, 379 F.2d 559, 568, 177 Ct.Cl. 870 (1966). The trial court did not err in utilizing A.G.C. rates in its computations as actual costs were unavailable.

■ Layne-Atlantic also argues that no competent evidence supports the award of overhead and profits. Layne-Minnesota offered the testimony of Lindeke to establish its overhead costs. Lindeke testified that seventeen percent was a reasonable amount to cover general overhead costs. Layne-Atlantic characterizes Lindeke as a geological engineer and incompetent to testify about such accounting matters. However, the evidence establishes that Lindeke as an officer and part-owner of Layne-Minnesota was familiar with its accounting practices. Vry testified that the contract price, as originally estimated, was adequate to cover expected costs and return a profit of fifteen percent. The trial court did not err in

---

**5.** The trial court did not err in finding that Layne-Atlantic was subject to the trial court's jurisdiction. Layne-Atlantic entered into a contract with a Minnesota resident that was performed in part in Minnesota. *See* Minn. Stat.Ann. § 303.13, subd. 1(3); *Dahlberg Company v. Western Hearing Aid Center*, 259 Minn. 330, 107 N.W.2d 381 (1961), *cert. denied*, 366 U.S. 961, 81 S.Ct. 1921, 6 L.Ed.2d 1253 (1961).

using these percentages in its damage calculations.

Layne-Atlantic finally argues that the trial court erred in awarding prejudgment interest since the amount of damages was unliquidated and not readily ascertainable by computation or some generally recognized standard. Prejudgment interest in Minnesota is awarded only if damages are liquidated or, if unliquidated, are readily ascertainable by computation or by application of a general standard on the date the action accrues. *Alley Construction Co., Inc. v. State*, 300 Minn. 346, 353, 219 N.W.2d 922, 926–927 (1974); *Potter v. Hartzell Propeller, Inc.*, 291 Minn. 513, 518, 189 N.W.2d 499, 504 (1971); *Moosbrugger v. McGraw-Edison Company*, 284 Minn. 143, 160, 170 N.W.2d 72, 82 (1969). The courts differentiate between liquidated and unliquidated damages because it is "unreasonable to require defendant to compensate plaintiff * * * where defendant could not have readily determined the amount of damages himself * * * although in both cases plaintiff actually suffers loss of use of his money from the date of the wrongful act, for which loss he theoretically should be compensated." *Potter v. Hartzell Propeller, Inc., supra*, 291 Minn. at 518, 189 N.W.2d at 504. The trial court awarded Layne-Minnesota prejudgment interest because most of Layne-Minnesota's costs were undisputed and the remaining costs, such as equipment costs, were ascertainable by reference to industry standards.

However, the amount of damages assessed against Layne-Atlantic was contingent on factors other than Layne-Minnesota's total costs. Layne-Minnesota alleged that Ballenger-Potashnick and the Puerto Rican Highway Authority caused the damage to Layne-Minnesota. The amount of damages attributable to Layne-Atlantic was a significant issue in the trial and subject to a considerable amount of conflicting evidence.

Layne-Minnesota contended that Layne-Atlantic was responsible for the value of the work done by Layne-Minnesota in washing down the sides of the holes to prepare them for inspection. Layne-Atlan-

tic argued that it was not responsible. The value of the work was variously set at $35,268 based on Layne-Minnesota's original estimate; $42,390 based on Singer's billing against Ballenger-Potashnick; and $48,850.20 based on Singer's accounting records. The trial court determined that Layne-Atlantic was not responsible for the value of the work. It found that the value of the work was $42,000 and subtracted this amount from Layne-Minnesota's total costs.

Layne-Atlantic also contended that part of the delay time was caused by lack of access to the drill site and inadequate site preparation which were responsibilities of Ballenger-Potashnick. The trial court found that these factors accounted for two percent of the delay time and subtracted two percent of the costs of delay from total costs.

Prejudgment interest is not allowed if the apportionment of damages was not readily ascertainable before trial. *Northern Petrochem Co. v. Thorsen & Thorshov, Inc.*, 297 Minn. 118, 132, 211 N.W.2d 159, 169 (1973). Thus, the trial court erred in allowing prejudgment interest since the amount of damages attributable to Layne-Atlantic could not be readily ascertained before trial.

The judgment of the trial court is affirmed in part and reversed in part.