PEARL J. FUCHS, AND THE OMAHA NATIONAL BANK AND PEARL J. FUCHS, CO-ADMINISTRATORS OF THE ESTATE OF BERT L. FUCHS, DECEASED, APPELLANTS AND CROSS-APPEL-LEES, V. PARSONS CONSTRUCTION COMPANY, A CORPORATION, APPELLEE AND CROSS-APPELLANT.

111 N. W. 2d 727

Filed November 17, 1961.    No. 34998.

*Crawford, Garvey, Comstock & Nye,* for appellants.

*King & Haggart,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

CARTER, J.

Plaintiffs commenced this action against the defendant for the breach of a building contract, alleging that defendant failed to comply with the plans and specifications during the course of construction to plaintiffs' damage in the amount of $200,000. The trial court sustained a motion for directed verdict or to dismiss at the close of all the evidence on all grounds asserted except the defense of res judicata. The plaintiffs appealed. The defendant cross-appealed from the adverse ruling of the trial court that res judicata was not a defense. Upon the death of Bert L. Fuchs, during the pendency of the action, his interest was revived in the names of The Omaha National Bank and Pearl J. Fuchs as Co-Administrators of the Estate of Bert L. Fuchs, deceased.

It is evident that if the defense of res judicata was a valid one it would finally terminate the litigation. We deem it necessary therefore to first dispose of that issue.

The record discloses that Bert L. Fuchs and Pearl J. Fuchs commenced an action in the district court for Douglas County against Parsons Construction Company,

the contractor, and Steele, Sandham & Steele, the architects, jointly to recover for the faulty construction of the building involved in the present case. A demurrer was filed to this petition by each defendant on three grounds: (1) that there was a defect of parties defendant, (2) that several causes of action were improperly joined, and (3) that the petition did not state a cause of action. The court sustained the separate and general demurrers of each defendant. An appeal was taken therefrom by the plaintiffs which resulted in an opinion and judgment of this court. Fuchs v. Parsons Construction Co., 166 Neb. 188, 88 N. W. 2d 648. The defendant asserts that the final judgment is res judicata of the issues in the present case. While it is true that the opinion in the former case holds that the demurrers were properly sustained, and nothing more, and sustained the dismissal of the action upon failure of plaintiffs to further plead, an examination of the opinion clearly reveals that the affirmance was based on the improper joinder of causes of action against improperly joined defendants. This court did not determine the issues on their merits but on the form of the action. It is the general rule that a judgment on the merits only may properly be pleaded as res judicata. The case clearly falls within the rule announced in Yates v. Jones Nat. Bank, 74 Neb. 734, 105 N. W. 287, wherein it is said: "But a judgment on a demurrer, which is based on a technical defect of pleading, a lack of jurisdiction, misjoinder of parties, or the like, does not involve the merits of the controversy, and is not available as res judicata. * * * When a plea of res judicata is interposed, the controlling question is whether the judgment offered to support it is based on the merits of the controversy." See, also, Clark v. Lincoln Liberty Life Ins. Co., 139 Neb. 65, 296 N. W. 449; Robinson v. Dawson County Irr. Co., 142 Neb. 811, 8 N. W. 2d 179. The opinion in the former suit clearly shows that the dismissal in the trial court was affirmed for the reason that there was a misjoinder

of parties defendant and causes of action, and not on the merits of the case. See Trainor v. Maverick Loan & Trust Co., 92 Neb. 821, 139 N. W. 666. The mandate of this court should be construed in connection with the opinion of the court. State ex rel. Johnson v. Hash, 145 Neb. 405, 16 N. W. 2d 734; Elliott v. Gooch Feed Mill Co., 147 Neb. 612, 24 N. W. 2d 561. This is so whether or not a copy thereof is attached to the mandate if the opinion appears in the published reports.

The defendant contends that when plaintiffs elected to appeal rather than to divide their causes of action against the improperly joined defendants in accordance with section 25-809, R. R. S. 1943, they made an irrevocable election and are estopped from filing new actions against the proper parties. Such a rule in the present case would place the plaintiffs in a dilemma from which they could not escape. If they did not appeal, the sustaining of the general demurrer followed by a dismissal would validate the defense of res judicata. See Trainor v. Maverick Loan & Trust Co., *supra.* If they appealed then they would be estopped from filing new actions because of their election to appeal. The law does not contemplate placing a party in such an impossible position. Plaintiffs are clearly entitled to file separate actions against the misjoined defendants which they may prosecute, providing the final judgment on appeal in the prior case does not decide the litigation on the merits. Trainor v. Maverick Loan & Trust Co., *supra;* Palchi v. Robbins, 272 Mich. 411, 262 N. W. 381.

The evidence will be considered under the familiar rule that a motion for a directed verdict must, for the purpose of decision thereon, be treated as an admission of the truth of all material and relevant evidence submitted on behalf of the party against whom the motion was directed, and such party is entitled to have every controverted fact resolved in his favor and to have the benefit of every inference that can reasonably be

deduced therefrom. Johnston v. Robertson, 171 Neb. 324, 106 N. W. 2d 192.

Plaintiffs contracted in early 1953 for the services of Steele, Sandham & Steele, architects, in connection with the proposed construction of a building at 2401 North Eleventh Street in Omaha. Pursuant to this contract the architects prepared plans and specifications for the building and bids were taken for its construction. The defendant Parsons Construction Company was the successful bidder. The construction of the building was commenced in June 1953 and completed in March 1954. The lessee of the building, Fuchs Machinery & Supply Company, started to move into the building in December 1953, and completed the moving operation in February 1954.

The evidence shows that in April of 1954 the building began to settle. The west side of the building settled to such an extent that it was visible from the adjoining street. Windows in the building cracked, and interior partitions pulled away from the ceiling and floor. The floor settled as much as 10.5 inches in places. Cracks appeared in the exterior walls. Doors could not be opened and closed. Built-in fixtures were materially damaged. In places the plumbing was damaged. The steel superstructure supporting the roof became twisted and out of alignment. It is not disputed that the building was badly damaged. The action is against the contractor for the breach of its contract to construct the building in accordance with the plans and specifications.

The primary cause of the damage appears to have been the settling of the piles which support the exterior walls and the interior columns, all of which support the steel superstructure of the building. The specifications recite that investigation indicates that rock will be encountered at 27.5 feet and it is contemplated that piles will be driven to refusal at that elevation. The specifications provide for the driving of three test piles to permit the engineer supervising the work to verify or

modify the basic lengths of the piles provided for therein.

Four test holes were driven by the defendant instead of the required three. The evidence shows that the location of the building was on "made" ground by the Missouri River, which had subsequently been used as a city dump. The test borings confirmed these facts and also the existence of a ledge of limestone at about 31 feet below the surface of the ground. The test borings were unsatisfactory in determining the consistency and strength of the rock ledge, and indicated little resistance in the formations below it for an approximate distance of 30 or 40 feet. For these reasons the specifications provided for the driving of the test piles to determine the point to which the piles should be driven to sustain the designed load.

It was determined by the structural engineer employed by the architects that these 8-inch piles, measured at the small end of the piles, should be driven with a 3,120-pound hammer with a 10-foot drop until it required 5 blows to move the pile downward for a distance of $5\frac{3}{8}$ inches, which by a formula explained in the record indicated that the pile would sustain a load of 15 to 20 tons. Such a bearing was deemed adequate by the structural engineer and the architects. The driving of the test piles was witnessed by the structural engineer, the architect's engineer, and both the job sponsor and the construction superintendent for the defendant. The instructions of the architects' consulting structural engineer following the tests were to drive the piles to the depth that would show a bearing of 15 to 20 tons and then stop, it being feared that otherwise the penetration of the rock ledge would result, and the bearing lost which was necessary to support the designed load. These directions admittedly were conveyed to defendant's job sponsor, who in turn passed them on to the construction superintendent charged with driving the piles. The piles were so driven by the defendant under the supervision of the architects' engineer. This is evidenced

further by the fact that the architects' engineer wrote on the original plans "Single piles 30 ft. clouster 26 ft.," indicating that the piles were not to be driven to or through the rock ledge.

The contract provides that the construction of the building was to be supervised by the architects as the agent of the owner. It was further stated that the architects were to make any needed interpretations of the plans and specifications and see to it that the building was constructed in conformity with such plans and specifications. Any variations from such were to be authorized by the architects by written authorization only. It is the contention of plaintiffs that the specifications required the piling to be driven to refusal and that this was not done, and that there was no written modification of the specifications that would permit the defendant to drive the piles otherwise.

The foregoing issue involves the meaning of the term "refusal" contained in the specifications. Plaintiffs contend that it means that the piles should be driven until they would not move downward. We cannot agree with this definition under the evidence adduced in this case. The term "refusal" is rather meaningless unless the weight and fall of the hammer is prescribed. Certainly the point of refusal as defined by plaintiffs would be less with a 500-pound hammer and a 10-foot drop than a 3,000-pound hammer with a 15-foot drop. Factors were lacking in the specifications to accurately determine the meaning of "refusal" as used therein. It was for the architects under the terms of the contract to interpret the meaning of the terms used under such circumstances. The architects through their consulting structural engineer defined the term by the directions he gave as to the driving of the piles. On the witness stand he defined the term as the point "where we expect to develop the resistance that is adequate for this particular job." Other engineers testified similarly to the meaning of the term, although there was evidence to

the contrary. We think this definition must be accepted in the absence of a more specific definition in the contract. The specifications state that rock would probably be encountered at 27.5 feet and it is contemplated that piles will be driven to refusal *at that elevation*. These provisions of the specifications indicate that the definition advanced by plaintiffs was not intended. The evidence shows that there was no splitting or brooming of the piles for the reason that the force applied to the piles was not sufficient to produce such results. We conclude that the defendant contractor drove the piles in accordance with the plans and specifications and the directions of the architects and their consulting structural engineer. It is at least apparent that the piles were driven in accordance with directions of the architects and their consulting structural engineer who, as the interpreters of the plans and specifications by contractural provision, were the final authority and whose instructions the contractor was obliged to follow. Plaintiffs have therefore failed to show a breach of contract on the part of the defendant contractor in the manner and method of driving and placing the piles.

The expert evidence in the record indicates that the piling was to support the walls and superstructure of the building. The weight of the floor was to be carried by the soil underneath. This was one of three plans devised and explained to the owner. The owner chose the type designed by the architects in the plans and specifications. The plans and specifications called for a ¾-inch expansion joint between the floor slab and the exterior walls for the entire perimeter of the building except at the dock area. The caps on the piling supporting the interior columns were designed to be covered with two inches of concrete to make them conform to the level of the floor. Two-inch-cut trowel joints were to be made around the perimeter of the caps to permit the breaking of the concrete at such points if the floor settled. The wire mesh reinforcing was to extend only to the trowel

cuts in furtherance of the plan to anticipate the settling of the floor. The evidence shows that the defendant failed to make the trowel cuts and to limit the wire mesh to the perimeter of the trowel cuts when the pouring of the floor commenced. The architects' engineer observed this departure from the plans and specifications and directed compliance. The defendant made the corrections in accordance with the instructions. It is evident that the corrections were approved by the architects' engineer and by one of the architects himself when final payment was authorized by him. We fail to find any breach of contract by the defendant with regard to the wire mesh and trowel cuts.

Plaintiffs contend that the contract was violated when the defendant permitted a concrete ledge to form around the inside perimeter of the building at a point 8 inches below the surface of the 6-inch concrete floor. This resulted in the outside edges of the floor being held up and thereby prevented the settlement of the floor any more than 2 inches on its outside edges. This is asserted as a damage in that the floor was not permitted to settle uniformly on the supporting earth.

In respect to this concrete ledge projecting into the building, the evidence shows the following: The plans and specifications originally called for grade beams 5 feet deep and 8 inches wide to be constructed with metal or wood forms. The grade beam level was subsequently lowered by 3 feet on the written directions of the architects. This caused the grade beam to be constructed through the ruble and debris in the soil which had its origin in its former use as a public dump. Because of the additional expense of construction of the grade beams through this ruble and debris, the architects authorized the trencher method of forming the grade beam without the use of wood or metal forms. Thus the earthen sides of the trench constituted the form of the grade beam. The defendant, however, used a wood form at the top of the grade beam around the perimeter of

the building in order to have a level base for the concrete block wall construction. In vibrating the poured concrete it was forced out under the form used in shaping the top of the grade beam. The concrete set and formed an irregular shelf or ledge around the building about 2 inches below the bottom of the floor. The shelf or ledge was apparent to anyone for a long period of time. The defendant's job sponsor observed it and concluded that it was unimportant. The architects' engineer supervising the job made no complaint about it, although it was open to view for several months. It is evident that no one felt that the floor would settle to this level. While it is true that the shelf or ledge did hold up the floor to some extent around the inside perimeter of the building after it had settled 2 inches, it was not the cause of the settling of the building. The use of the trencher method was properly authorized. The architects' engineer was required to be present under the terms of the contract when the pouring of the grade beam was commenced, and to give his consent thereto. He approved the methods employed after inspection. In addition thereto, there is expert evidence in the record that the construction of the grade beam as shown was considered a good practice commonly used in the industry. The approval of the trencher method was known to produce irregular side walls. The failure to remove projecting concrete extending into the building, under all the circumstances shown, does not constitute an actionable breach of the contract. It is evident that the shelf or ledge would have played little part in the overall picture except for the settling of the piles and the unusual settling of the earth under the floor. The proximate cause of the floor damage was the overloading of the piles and the settling of the ground and compacted fill designed to bear the weight of the floor. The shelf or ledge was incidental to the damage caused by the settling of the piling and the compacted earth upon which the floor was designed to rest. The dam-

age would have occurred irrespective of the existence of the shelf or ledge.

It is contended that the provision in the contract for supervision by the architects required an architect's presence on the job continuously, and that such supervision was not provided. If there was a failure on the part of the architects in this respect, a matter which we do not decide, it is not chargeable to the defendant contractor.

The record shows that the final payment on the contract was certified by the architects on March 31, 1954, and paid by the owner. The effect of the architects' certificate is that the building had been completed in accordance with the plans and specifications and that final payment was in order. The specifications provide: "Only final payment shall be construed as an acceptance, and no payment whatever shall be construed as an acceptance of any departure from the contract."

An architect employed by the owner is the agent of such owner in supervising construction work and in the interpretation of plans and specifications relating thereto. Erskine v. Johnson, 23 Neb. 261, 36 N. W. 510; 3 Am. Jur., Architects, § 5, p. 1000.

The general rule as to a contractor's liability is stated in Friederick v. County of Redwood, 153 Minn. 450, 190 N. W. 801, and quoted with approval in Fuchs v. Parsons Construction Co., supra, as follows: "Where a contractor makes an absolute and unqualified contract to * * * perform a given undertaking, it is the general * * * rule that he assumes the risks attending the performance of the contract * * *. But where he makes a contract to perform a given undertaking in accordance with prescribed plans and specifications, this rule does not apply. Under such a contract he is not permitted to vary from the prescribed plans and specifications even if he deems them improper and insufficient; and therefore cannot be held to guarantee that work performed as required by them will be free from defects, or withstand

the action of the elements, or accomplish the purpose intended. Where the contract specifies what he is to do and the manner and method of doing it, and he does the work specified in the manner specified, his engagement is fulfilled, and he remains liable only for defects resulting from improper workmanship or other fault on his part." The foregoing rule is applicable in the absence of fraud or bad faith, or such gross negligence as would amount to bad faith or failure to exercise honest judgment on the part of the architects in certifying complete performance in accordance with the plans and specifications. Plaintiffs in their reply allege fraud, gross mistake, bad faith, and a failure to exercise honest judgment because of the architects' connivance with the defendant in willful disregard of the duties of each to the plaintiffs. There is no evidence in this record tending to support the foregoing allegations, nor any evidence from which the truth of these allegations could be inferred. The plaintiffs have failed to establish an actionable breach of the construction contract and consequently the contractual effect of payment in full is unrelated to the situation before us.

Due to the conclusion reached, it is not necessary to consider other errors assigned. We conclude that defendant constructed plaintiffs' building in accordance with the plans and specifications as interpreted by the architects and the architects' instructions given in their capacity as agent of the owner. The plaintiffs failed to prove a cause of action against the defendant and the trial court properly directed a verdict in defendant's favor.

AFFIRMED.