HOME FURNITURE, INC., A NEVADA CORPORATION, APPELLANT, v. BRUNZELL CONSTRUCTION COMPANY, INC., A NEVADA CORPORATION, RESPONDENT.

No. 5404

May 3, 1968                    440 P.2d 398

[Rehearing denied May 31, 1968]

*Guild, Guild & Cunningham* and *Drennan A. Clark* and *David W. Hagen,* of Reno, for Appellant.

*Streeter, Sala & McAuliffe,* of Reno, for Respondent.

**OPINION**

By the Court, MOWBRAY, J.:

Home Furniture, Inc. appeals from a $10,000 judgment awarded Brunzell Construction Company, Inc. for the remaining balance due on the construction of the Home Furniture building in Reno.

On November 17, 1959, the parties entered into a written contract in the total sum of $845,623.79 for the construction of a 6-story furniture building. The contract provided for progress payments with the provision that 10 percent of the contract price could be withheld until 35 days after filing of the notice of completion, which was filed by appellant on March 17, 1961. Appellant made all payments on the contract except $10,000, which appellant withheld, asserting that respondent had not constructed the building in accordance with appellant's plans and specifications and that appellant had been damaged as a result of respondent's faulty performance in the sum of $40,000. The case was pretried, and it was stipulated at the pretrial conference that $10,000 was due respondent pursuant to the construction contract and that appellant would have the burden of proving failure of performance by respondent and the damages that resulted. The faulty performance complained of is narrowed to the specified tolerance level[1] of the slab finish of the concrete, prestressed sixth floor, or roof, which, it was found, several months after the building had been occupied, puddled, or retained "bird baths" after the summer showers. The learned trial judge, in his written decision, found this condition was not due to respondent's failure of performance of the contract and ordered judgment entered for respondent accordingly. We agree, and affirm the judgment.

The construction contract of October 15, 1959, consisting of 124 single-spaced typewritten pages, is most complete in its detailed specifications as to the materials to be used and the manner in which the prestressed concrete slab floors were to be poured and jacked into position. The plans and specifications were drawn and prepared by the appellant's architect, Ralph Berger, A.I.A., of San Francisco.

An architect employed by the owner is the agent of such owner in supervising construction work and in the interpretation of plans and specifications relating thereto. Erskine v. Johnson, 36 N.W. 510 (Neb. 1888); 3 Am.Jur., Architects § 5, at 1000. Indeed, Mr. Leo Myer Ginsburg, President of appellant, testified at the trial, on direct examination by Mr. Hagen:

---

[1]"*SLAB FINISHES:* After placing and leveling, tamp surface with a metal grid tamper to force coarse aggregrate below the surface and wood float to a level surface. When surface water is evaporated, dust with a dry thin layer of 1 part cement and 2 parts sand and steel trowel to a smooth finish. Tolerance shall be $3/16''$ out of level using a 10 ft. straight-edge in any direction."

"Q. Did you hire the architect to prepare the plans for the construction?

"A. Yes.

"Q. Did he prepare drawings for the construction of the building?

"A. Yes."

And on cross-examination by Mr. McAuliffe, Mr. Ginsburg testified:

"Q. As I understood your direct examination, Mr. Ginsburg, you hired Mr. Berger to design this building; is that correct?

"A. Yes.

"Q. Did you specify to Mr. Berger what you wanted in the way of a building?

"A. Yes."

The contract set forth the general scope of the work to be performed[2] and provided that the owner's architect would, at all times, have access to the work and that the contractor would provide proper facilities for inspection.[3] The contractor

---

[2] "SCOPE: The work to be performed under this contract consists of furnishing all plant, labor, materials, tools, equipment, transportation, power, water, permanent and temporary utilities, connections, provisions for safeguarding of workmen and public required by law, incidentals and work necessary for the completion of the project in strict accordance with the contract documents. Adjacent property foundations and structure shall be protected as required. The Contractor, subcontractors, or their successors shall employ 100% Union Labor and pay the prevailing wage scales on the work in accordance with the agreements and rules of the Unions in the localities having jurisdiction over the work to be done.

"In general the Contractor shall demolish and remove from the site all structures, walls necessary for the proper preparation of the site; build, maintain and illuminate temporary barricades, covered walks, fences, gates required by the City of Reno.

"A six story and mezzanine building with pent houses shall be constructed of both reinforced concrete walls and slabs and lift-up prestressed concrete floors using steel columns. Interiors shall in general be exposed concrete and lath and plaster with floor covering, air conditioning and electrically illuminated as scheduled. Carpets will be furnished and installed by the Owner. The exterior will have painted exterior walls with masonry and tile facings, with display windows. The building will be Type I as classified by the Uniform Building Code and will be in a Fire Zone 1 as classified by the City of Reno."

[3] "INSPECTION: The Architect and his representatives shall at all times have access to the work wherever it is in preparation or progress and the Contractor shall provide proper facilities for such access and for inspection.

"When the specifications, the Architect's instructions, laws, ordinances or any public authority require any work to be specially tested or approved, the Contractor shall give the Architect timely notice of its readiness for inspection, and if the inspection is by another authority

was required to keep on the job site a competent superintendent approved by the architect.[4] The architect had the duty of general supervision of the entire project.[5]

The question presented is: Did the contractor follow the plans and specifications furnished by the owner's architect, or did he vary from them and not perform in accordance with the contract? The law is well settled in practically every American jurisdiction that, where a contractor has followed the plans and specifications furnished by the owner and his architect, he will not be responsible to the owner, at least after the work is completed, for any loss or damage which results solely from the defects or insufficient plans or specifications, in the absence of any negligence on the part of the contractor or any express warranty by him as to their being sufficient or free from defects. This rule was well stated in Friederick v. Redwood County, 190 N.W. 801, 802 (Minn. 1922):

"Where a contractor makes an absolute and unqualified contract to construct a building or perform a given undertaking, it is the general, and perhaps universal, rule that he assumes the risks attending the performance of the contract, and must repair and make any injury or defect which occurs or develops before the completed work has been delivered to

than the Architect, of the date fixed for such inspection. Inspections by the Architect shall be promptly made, and where practicable at the source of supply. Any work covered up without approval or consent of the Architect, must, if required by the Architect, be uncovered for examination at the Contractor's expense.

"Re-examination of questioned work may be ordered by the Architect and such work must be uncovered by the Contractor. In the event such work is found to be in accordance with the Contract Documents the Owner shall pay the cost of re-examination and replacement, but if such work is not in accordance with the Contract Documents the Contractor shall make all necessary corrections and replacements and pay all costs in connection therewith."

[4]"SUPERINTENDENCE, SUPERVISION: The Contractor shall keep on the work, during its entire progress, a competent superintendent and any necessary assistants, all satisfactory to the Architect. The superintendent shall not be changed without consent of the Architect. The superintendent shall represent the Contractor in his absence and all directions given to him shall be as binding as if given to the Contractor. Except when of obviously minor nature such directions shall be confirmed in writing to the Contractor."

[5]"ARCHITECT'S STATUS: The Architect shall have general supervision and direction of the work. He is the agent of the Owner to the extent provided in the Contract Documents and when authorized by the Owner so to act. He has authority to stop the work whenever such stoppage may be necessary to insure the proper execution of the Contract."

the other party. *But where he makes a contract to perform a given undertaking in accordance with prescribed plans and specifications, this rule does not apply.* Under such a contract he is not permitted to vary from the prescribed plans and specifications even if he deems them improper and insufficient; and *therefore cannot be held to guarantee that work performed as required by them will be free from defects, or withstand the action of the elements, or accomplish the purpose intended.* Where the contract specifies what he is to do and the manner and method of doing it, and he does the work specified in the manner specified, his engagement is fulfilled and he remains liable only for defects resulting from improper workmanship or other fault on his part, unless there be a provision in the contract imposing some other or further obligation." See Annot, 6 A.L.R.3d 1396 (1966); Fuchs v. Parsons Constr. Co., 111 N.W.2d 727 (Neb. 1961); Havard v. Bd. of Supervisors, 70 So.2d 875 (Miss. 1954); Puget Sound Nat'l Bank v. C. B. Lauch Constr. Co., 245 P.2d 800 (Idaho 1952); Woods v. Amulco Prods., 235 P.2d 273 (Okla. 1951); Annot., 88 A.L.R. 797 (1934).

The record before the trial court supports the trial judge's decision. Appellant failed to show any deviation by the contractor from the architect's plans and specifications. On the contrary, Mr. Berger, the architect, testified that the pre-stressed concrete slab floor in question was poured in accordance with the specifications of the contract.

By Mr. McAuliffe:

"Q.   As far as you know, all the concrete that was poured into this particular slab met the specifications?

"A.   Yes.

"Q.   And it passed all the tests?

"A.   We never had any controversy or anything over that.

"Q.   Was there engineering supervision on the job during the lifting of these slabs?

"A.   During the lifting, I don't believe there would be supervision by superintendents, although I believe that—and to what extent I don't know—a local engineer by the name of Webster Brown was employed by Mr. Fitzgerald to observe this.

\* \* \* \* \*

"Q.   Well, the way these jobs go, if any problems develop upon the job, the architect is notified immediately; isn't he?

"A.   Of anything, yes.

"Q.   And you were never notified of any difficulties during the lifting of this slab, were you?

"A.   No.

"Q. So, as far as you know, this particular slab, the form was inspected before the concrete was poured, the structural members that went into that slab were inspected before the concrete was poured, the concrete was tested, and it met the specifications, and there were no problems during the lifting?

"A. As far as I know, no."

Later Mr. Berger testified that the floor in question had not been designed as a roof.

By Mr. McAuliffe:

"Q. As I understand your testimony, Mr. Berger, the floor that we are talking about, this slab, it was never intended by you in the design of it to be a roof?

"A. No.

"Q. Was it ever intended by you, in the design of it, to be a final surface for that roof?

"A. No.

"Q. Or to set a final level?

"A. No.

\* \* \* \* \*

"Q. But the owner never decided whether he wanted a roof or a floor?

"A. That's correct. \* \* \*

\* \* \* \* \*

"Q. But did you ever specify anything for the contractor to do [regarding the use of the sixth floor]?

"A. Well, there was two or three considerations of the future development of this roof. In other words, it was to be used as a sales area. The function of the roof was not firmed up, so to speak. In other words, it could have been an outdoor sales area. It was also contemplated sometime, of putting a roofed area, and then it could be an additional floor.

\* \* \* \* \*

"And then there was consideration of a future development of the entire floor.

"In the meantime, the time just went on, and no decision was made whether to correct the roof with the present topping, or putting another topping on it and using it as a roof, and at a later date—

\* \* \* \* \*

"Q. At the time you drew the working drawings for this building, you knew that the roof was intended to be utilized for a sales area; did you not?

"A. Yes.

"Q. Was any final design shown on those plans as to this sales area?

"A. No. The provision was made for a possible future use. The intention was to put a wear surface of material, such as tile or concrete, on top of this. Or, as previously stated, they might sometime even put a roof over the thing and use it for an additional floor.

\* \* \* \* \*

"Q. Is it customary in building a roof, any roof, to build a dead flat roof?

"A. I think that we have to go beyond your question. I can't answer that. When we look at this slab as a roof, it was not intended as the final roof.

"Q. You did not consider this slab to be a roof?

"A. No, it's a floor.

"Q. It's a floor?

"A. Right.

"Q. Do you build floors the same way you build roofs?

"A. No, we don't build floors the same as you build roofs.

"Q. You don't build them to serve the same function, do you?

"A. No."

The testimony of respondent's superintendent, Dean Kishpaugh, corroborates the testimony of the architect, Berger.

Questions by Mr. McAuliffe:

"Q. And did you work full time on the Home Furniture Building?

"A. Yes.

"Q. From start to the end of the job?

"A. Yes.

"Q. You were on the job, then, every day?

"A. Yes.

"Q. At the time the slab in question was poured, was that done under your supervision?

"A. Yes.

"Q. Was there anyone else there that was supervising the construction of that slab?

"A. The architect's representative.

"Q. Was that an engineer?

"A. Mr. Web Brown, the engineer in Reno here, yes; and Thomas Fitzgerald is the engineer from San Francisco who made periodic visits to the job.

"Q. And were the form[s] inspected both by you and the engineer, in your presence, when you were ready to pour?

"A.   Yes. He came to the job every time we got ready to pour concrete and inspected all the reinforcing and the post-tension cables and forms, and he observed the pouring of concrete.

\* \* \* \* \*

"Q.   Did you experience any difficulty during the lifting operation?

"A.   No, it went very smooth.

"Q.   Did you ever have any objection from the architect or engineer on the job that it was not being properly lifted?

"A.   No.

"Q.   Were you inspected during the lifting operation?

"A.   Yes, sir. We had the engineers of the lift-slab contractor, the architect's engineers and then the architect himself was on the job several times during the lifting operation.

\* \* \* \* \*

· "Q.   Did you ever have any conversation with the owner during the course of construction about some type of flooring surface which might eventually be applied to the top of the slab?

"A.   Well, the Ginsburgs' store was just down the street from the building that we were building, and they were over to the job every day. Every day at lunch time they came by, and we were very friendly, and we talked. And if they asked me once, they must have asked me fifty times about the term—they called it a calculated risk—of the building being flat on the top, and there was no paper on the roof.

"And my answer was always the same: 'You have an architect. He designed the building. We are only building it. You ask him,' because we don't like to put ourselves in the position where we are telling the owner things to do. We are only builders."

In view of this record, it most certainly was permissible for the trial judge to find that respondent contractor had performed in accordance with the plans and specifications of the contract.

Appellant next urges that the architect failed to give his final certificate of payment and respondent is thereby barred from recovery of the $10,000 payment. This issue was never raised

by the pleadings nor made an issue in the pretrial conference and enters the trial for the first time during counsel's final argument, which is not part of the record on appeal. Under NRCP 12(h)[6], the defense is deemed waived.

The trial judge awarded, and properly so, interest on the $10,000 at 7 percent per annum to run from 35 days after the notice of completion was given on March 17, 1961. The award was made in accordance with NRS 99.040.[7]

The judgment must be affirmed with costs.

Affirmed.

THOMPSON, C. J., COLLINS, ZENOFF, and BATJER, JJ., concur.

---

[6]NRCP 12(h): "A party waives all defenses and objections which he does not present either by motion as hereinbefore provided or, if he has made no motion, in his answer or reply, except (1) that the defense of failure to state a claim upon which relief can be granted, the defense of failure to join an indispensable party, and the objection of failure to state a legal defense to a claim may also be made by a later pleading, if one is permitted, or by motion for judgment on the pleadings or at the trial on the merits, and except (2) that, whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action. The objection or defense, if made at the trial, shall be disposed of as provided in Rule 15(b) in the light of any evidence that may have been received."

[7]NRS 99.040: "When there is no express contract in writing fixing a different rate of interest, interest shall be allowed at the rate of 7 percent per annum upon all money from the time it becomes due, in the following cases:

"1. Upon contracts, express or implied, other than book accounts."