MAYVILLE–PORTLAND SCHOOL
DISTRICT NO. 10, Plaintiff
and Appellee,

v.

C. L. LINFOOT COMPANY and U. S.
Fidelity & Guaranty Company,
Defendants and Appellants.

Civ. No. 9386.

Supreme Court of North Dakota.

Jan. 19, 1978.

Grindeland & Brudvik, Mayville, for plaintiff and appellee, argued by William J. Brudvik.

Shaft, McConn & Fisher, Grand Forks, for defendants and appellants, argued by John G. Shaft, Grand Forks.

ERICKSTAD, Chief Justice.

This is an appeal by C. L. Linfoot Company, a North Dakota corporation, defendant and appellant, (hereinafter Linfoot) from a judgment of the Traill County District Court which found in favor of the Mayville-Portland School District No. 10, plaintiff and appellee, (hereinafter School District) and against Linfoot.

The basic facts in this case are not in dispute. On May 28, 1974, Linfoot and the School District entered into a written contract wherein Linfoot agreed to furnish all materials and perform the plumbing work shown on the drawings and specifications for a new school, including the installation of an underground fiberglass water storage tank with appurtenant pipes and fixtures. (The dispute in this case involves the installation of the fiberglass storage tank.) The written contract consisted of several documents together with plans, drawings and specifications. The plans, drawings and specifications were furnished by the architect and the engineer and not by Linfoot. The contract also required Linfoot to follow the specifications of Owens/Corning, the manufacturer of the fiberglass tank, in the installation of the tank.

The fiberglass tank was supplied by and installed by Linfoot in the ground at the school site in the latter part of November, and the early part of December, 1974. It was understood by the parties at the time the tank was backfilled in December that the tank site would have to be partially re-excavated the following spring to complete work on the tank installation. This additional work consisted basically of installing a manway extension on the tank and a change order for some other work. When the tank site was uncovered by Linfoot on June 3, 1975, it was discovered that the tank was severely damaged and unfit for its intended use.

The fiberglass tank, as of June 3, 1975, had not been finally accepted by the architect, and pursuant to Section 2.2.12 of the General Conditions of the Contract for Construction, the architect rejected the tank. Demand was then made by the School District upon Linfoot to replace the tank. Linfoot refused to replace the tank unless it was compensated for doing so. The School District rejected this proposal and hired another contractor who installed an identical tank in an adjacent area. The School District then brought suit against Linfoot to recover the expense incurred by the School District in securing and installing the new tank.

This suit was based upon three grounds: breach of contract, breach of express warranty, and negligence. A trial was held before a judge of the First Judicial District, sitting without a jury on January 20 and 21, 1977.

After the trial, the court entered its findings of fact, conclusions of law, and order for judgment, and judgment was accordingly entered on March 23, 1977. In its findings of fact, the trial court found that Linfoot breached its contract, breached its express warranty, and was negligent. The court found that the School District was entitled to damages in the sum of $16,450.75, subject to Linfoot's right to set-off against the judgment in the amount of $9,298. This resulted in a net judgment for the School District of $7,152.75. It is from

this judgment that Linfoot appeals to this court.

Linfoot, in its appeal, disputes the findings of the trial court that it breached the contract, that it breached an express warranty, and that its negligence was the proximate cause of the damage to the tank. Linfoot further contends that the court erred as a matter of law in determining that a contractor could be liable under any circumstances, when the contractor specifically followed the plans and specifications prepared by the owner's (School District's) architect.

We will deal with Linfoot's last contention first. It is undisputed by the parties that the School District employed the architect, who in turn employed the engineer. The plans and specifications for the installation of the tank were furnished to Linfoot by the architect and engineer. Linfoot, as the contractor, was required to follow the plans and specifications furnished by the School District's architect and engineer.

There is a dispute over whether or not those specifications were followed to the letter by Linfoot. The dispute arises as to whether or not Linfoot properly backfilled the site when it covered the tank in December of 1975.

The School District contends that Linfoot failed to follow the Owens/Corning installation instructions in installing the tank. These instructions were incorporated into the contract by Section 4.4.4(b) of the Supplementary Conditions (Article 15) of the contract. Item six of these instructions, reads:

"Caution: Bricks or blocks used to support piping must be removed prior to filling to grade. Do not use rock, shale or debris for fill."

The School District contends that Linfoot failed to follow those instructions in that large wooden pallets were placed around the manway to the tank prior to backfilling. Mr. Opp, who supervised the field job for Linfoot, testified that these wooden pallets were so used.

Linfoot asserts that these pallets were not used to support piping, but were placed over the top of the pipes. Furthermore, it contends that there is no showing that these pallets being placed there had any connection with the damage to the tank.

For the purpose of this opinion, we will assume that Linfoot followed the specifications, and we will therefore not determine if the placing of these wooden pallets around the manway before backfilling was contrary to the specifications. The trial court made no such finding and we do not believe that such finding is necessary to support the judgment in this case.

Assuming Linfoot followed the plans and specifications to the letter, is it excused from liability in this case?

Linfoot points to the case of *United States v. Spearin*, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918), where the United States Supreme Court said:

"But if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications." 248 U.S. 136, 39 S.Ct. 61, 63 L.Ed. 169.

Linfoot also cites the annotation found in 6 A.L.R.3d at 1394 to support its position. In that annotation, the general rule is stated to be as follows:

" . . . the rule has become well settled in practically every American jurisdiction in which the matter has been involved, that a construction contractor who has followed plans or specifications furnished by the contractee, his architect, or engineer, and which have proved to be defective or insufficient, will not be responsible to the contractee for loss or damage which results, at least after the work is completed, solely from the defective or insufficient plans or specifications, in the absence of any negligence on the contractor's part, or any express warranty by him as to their being sufficient or free from defects." 6 A.L.R.3d 1394 at 1397.

We do not understand the rule stated in 6 A.L.R.3d or in *United States v. Spearin, supra* to automatically relieve the contrac-

tor of liability if he follows the specifications given to him by the contractee, his architect, or engineer. According to the annotation, the rule relieving the contractor of liability is limited by three things: (1) an absence of any negligence on the contractor's part, (2) an absence of an express warranty by the contractor that the plans or specifications are sufficient or free from defects, (3) proof that the plans or specifications were defective or insufficient.

This third limitation is also contained in the rule set out in *Spearin*. That rule states that "the contractor will not be responsible for the consequences of defects in the plans and specifications". In *Spearin*, a defective design of a sewer caused the problem. *See also Woods v. Amulco Products*, 205 Okl. 34, 235 P.2d 273 (1951), and *Kubby v. Crescent Steel*, 105 Ariz. 459, 466 P.2d 753 (1970). In both those cases, the rule is stated that the contractor who follows specifications is not liable for defects in specifications. Both courts held in favor of the contractor after finding the specifications to be defective or insufficient.

There are several cases from other jurisdictions which use slightly different language than that used above in stating the rule relieving the contractor of liability, which would seem to better support Linfoot's position. In *McCree & Company v. State*, 253 Minn. 295, 91 N.W.2d 713 (1958) the Supreme Court of Minnesota first quoted with approval the rule from *United States v. Spearin, supra,* and then stated:

"This court has stated the applicable rule and exception in *Friederick v. County of Redwood*, 153 Minn. 450, 451, 190 N.W. 801, 802, as follows:

'Where a contractor makes an absolute and unqualified contract to construct a building or perform a given undertaking it is the general, and perhaps universal, rule that he assumes the risks attending the performance of the contract, and must repair and make good any injury or defect which occurs or develops before the completed work has been delivered to the other party. But where he makes a contract to perform a given undertaking in accordance with prescribed plans and specifications, this rule does not apply. Under such a contract he is not permitted to vary from the prescribed plans and specifications even if he deems them improper and insufficient; and therefore cannot be held to guarantee that work performed as required by them will be free from defects, or withstand the action of the elements, or accomplish the purpose intended. Where the contract specifies what he is to do and the manner and method of doing it, and he does the work specified in the manner specified, his engagement is fulfilled and he remains liable only for defects resulting from improper workmanship or other fault on his part, unless there be a provision in the contract imposing some other or further obligation.' " 91 N.W.2d at 723.

This phrasing of the rule is also set out in *Fuchs v. Parsons Construction Co.*, 172 Neb. 719, 111 N.W.2d 727 (1961) and in *Home Furniture, Inc. v. Brunzell Construction Co.*, 84 Nev. 309, 440 P.2d 398 (1968).

A casual examination of the rule would not seem to require a showing that the plans or specifications are defective. Instead, the rule of nonliability appears to have only two limitations: (1) that the contractor is liable for defective workmanship or other fault, (2) liability can arise out of some other contractual provision. However, it is very important to note that in all three of these cases, the courts found that the plans or specifications were defective or insufficient.

Linfoot also cited a North Dakota case to support its position. *Murphy v. Kassis*, 59 N.D. 35, 228 N.W. 449 (1930). In that case, the court said:

"The builder is not responsible for defects arising from doing the work in the manner directed by the owner, or which are caused by acts of the owner during the progress of the work."

This rule was quoted with approval in *Dittmer v. Nokleberg*, 219 N.W.2d 201 (N.D.1974). This rule, however, requires

that the defects arise from doing work in the manner directed, and infers that the defects are caused by the directions. In *Murphy*, this rule relieved the contractor of liability when he was directed, against his protests, to install certain things when the building was very damp, resulting in some defects. In *Dittmer*, Nokleberg was held not responsible for the wavy walls in the building for the reason that these defects were caused by defective material which was supplied by the Dittmers.

■ These North Dakota cases and the cases cited from the other jurisdictions, therefore, do not automatically relieve the contractor of liability for defects when he has followed plans and specifications furnished by the other party. The contractor, however, may be relieved of liability if the plans or specifications furnished by the other party were defective or insufficient, and such defect or insufficiency caused the damage complained of.

The question arises as to who has the burden of proof as to whether or not the plans or specifications were defective or insufficient in this case. To answer that question, it is first necessary to determine who had the risk of loss in the contract at the time the tank was discovered to be damaged and unfit for its intended use.

*Kansas Turnpike Authority v. Abramson*, 275 F.2d 711 (10th Cir. 1960), *cert. denied*, 363 U.S. 813, 80 S.Ct. 1250, 4 L.Ed.2d 1154 (1960), in many ways, is a case similar to the case now before us. In that case a contractor entered a contract with the Kansas Turnpike Authority for the grading and drainage of a segment of the Kansas Turnpike. As in this case, the contractee provided the plans and specifications which the contractor was to follow. Before final acceptance as provided in the contract, unusual rains for a two week period softened the "upper lifts" of the embankment to such an extent that it was necessary to recompact them in order to bring them up to specifications. The question in that case was who should pay for the extra work required to meet the specifications. The circuit court determined that where the

contractor was following the specifications of the contractee, it was necessary to analyze the contract to see who bore the risk of loss. In that case, the court determined that the particular contract in question placed the risk of loss on the contractee. The contractor was thus entitled to payment for the extra work.

We, like the Tenth Circuit Court above, believe that in this case it is necessary to look at the contract to see who bore the risk of loss where neither party was at fault. Once we determine who had this risk of loss, we can determine who has the burden of proving whether or not the damage to the tank was caused by defective plans or specifications.

The School District contends that the risk of loss in the contract was on Linfoot until final acceptance by the architect. The tank was damaged and was therefore properly rejected by the architect. According to the School District, since Linfoot did not tender a tank acceptable to the architect, then, under the contract, Linfoot has the responsibility of replacing the tank. The School District contends this is true regardless of the cause of the defect in the tank.

Linfoot, on the other hand, contends that the risk of loss as set out in the contract was on the School District. It points to the document, General Conditions, Supplementary Conditions and Modifications, 0104, section 8. That section reads:

"8. Damages: If either party to this contract should suffer damage in any manner other than fire or extended coverage perils, or vandalism or malicious mischief, or other insured perils because of any wrongful act or neglect of the other party or of anyone employed by him, then he shall be reimbursed by the other party for such damage, provided the Owner shall be responsible for and at his option insure against loss of use of his existing property due to fire or otherwise, however caused. Claims under this clause shall be made in writing to the party liable within a reasonable time of the final payment, except as expressly stipulated otherwise in the case of faulty

work or materials, and shall be adjusted by agreement or arbitration.

"The Contractor is relieved of responsibility for damages to the work due to causes beyond the control of and without fault of the contractor or negligence of the contractor."

To determine who actually had the risk of loss prior to final acceptance, it is necessary to examine other relevant contract provisions. Section 9.7.1 of the General Conditions of the Contract for Construction, reads:

"9.7.1 When the Contractor determines that the Work or a designated portion thereof acceptable to the Owner is substantially complete, the Contractor shall prepare for submission to the Architect a list of items to be completed or corrected. The failure to include any items on such list does not alter the responsibility of the Contractor to complete all Work in accordance with the Contract Documents. When the Architect on the basis of an inspection determines that the Work is substantially complete, he will then prepare a Certificate of Substantial Completion which shall establish the Date of Substantial Completion, shall state the responsibilities of the Owner and the Contractor for maintenance, heat, utilities, and insurance, and shall fix the time within which the Contractor shall complete the items listed therein. The Certificate of Substantial Completion shall be submitted to the Owner and the Contractor for their written acceptance of the responsibilities assigned to them in such Certificate." ·

This section is supplemented by Section 9.7.1 of the Supplementary Conditions (Article 15) which reads:

"9.7.1 Add: At an agreed hour on the Date of Substantial Completion, the Owner becomes responsible for the care and operation of the accepted Work."

Section 2.2.12 of the General Conditions of the Contract for Construction gives the architect the authority to reject work which does not conform to contract documents. Section 13.2.1 of the same document, reads:

"13.2.1 The Contractor shall promptly correct all Work rejected by the Architect as defective or as failing to conform to the Contract Documents whether observed before or after Substantial Completion and whether or not fabricated, installed or completed. The Contractor shall bear all cost of correcting such rejected Work, including the cost of the Architect's additional services thereby made necessary."

Section 4.5.1 of the General Conditions of the Contract for Construction sets out the following warranty:

"4.5.1 The Contractor warrants to the Owner and the Architect that all materials and equipment furnished under this Contract will be new unless otherwise specified, and that all Work will be of good quality, free from faults and defects and in conformance with the Contract Documents. All Work not so conforming to these standards may be considered defective. If required by the Architect, the Contractor shall furnish satisfactory evidence as to the kind and quality of materials and equipment."

These provisions clearly show that the risk of loss before final acceptance was on Linfoot. The only provision which might indicate otherwise is Section 8 of the General Conditions, Supplementary Conditions and Modifications, 0104, relied on by Linfoot. It is important to note that Section 8 is the only modification in that document which does not refer to a specific section of the General Conditions. The other seven modifications in that document refer to the specific section number of the General Conditions which they modify.

Finding 15 of the district court's findings of fact found in effect that the risk of loss was on Linfoot until final acceptance. Finding 15 states:

"15. Paragraph Eight of MP 0104 of the contract which states that the contractor is relieved of responsibility for damages to the work due to causes beyond the control of and without fault of the contractor or negligence of the contractor is ambiguous and, as such, must

be construed in favor of the Plaintiff, School District, (NDCC 9–07–19). In construing this provision of the contract, the Court finds as a matter of fact that control of the tank site was within the Defendant at all times relevant hereto and that the Plaintiff assumed no responsibility for damage to work in progress under the contract. Fairness, equity and the standards of practical application require responsibility for work in progress to remain with the Defendant until final completion."

We agree with the district court that the provision in Section 8 relied on by Linfoot is ambiguous. The intended affect of Section 8, when it is read in connection with the other provisions of the contract (which clearly place the risk of loss on Linfoot), is impossible to determine. This is especially true in that Section 8 does not refer to any other section that it is to modify. The district court was correct then in applying Section 9–07–19, N.D.C.C., and construing that provision of the contract in favor of the School District. Section 9–07–19, N.D.C.C., reads:

"In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist. The promisor is presumed to be such party, except in a contract between a public officer or body, as such, and a private party, and in such case it is presumed that all uncertainty was caused by the private party."

In this case, a certificate of substantial completion was never issued, and thus the risk of loss remained with the contractor. With the risk of loss being on the contractor, that would normally settle the question of liability. Here, however, because of the contractor's obligation to follow the plans and specifications, we have a further question to pursue, i. e., were the plans and specifications defective, and if so, were they the proximate cause of the damages.

Having found that the risk of loss was on Linfoot before final acceptance, the burden of proof is on it to prove that the plans and specifications were defective and that they were the proximate cause of the damage.

In this case, Linfoot did not meet its burden at the trial to prove that the damage to the tank was caused by following defective plans or specifications. There is no finding by the trial court that the damage was caused by following defective plans and specifications, nor could there be such a finding from the evidence produced at the trial.

In light of the above discussion, it is clear that Linfoot breached its contract with the School District. The architect properly rejected the tank, and under Section 13.2.1 of the General Conditions of the Contract for Construction, Linfoot must bear all costs of correcting such rejected work. As Linfoot refused to replace the tank without reimbursement, the School District, under the contract, was entitled to hire another contractor to install the tank. Under Section 3.4.1 of the General Conditions of the Contract for Construction, Linfoot is responsible for paying the additional cost to the School District of correcting the defective work.

In finding 13 of its findings of fact, the trial court stated:

"13. The damage to the Owens Corning (Model C–3B) 6,000 gallon water storage tank occurred prior to notice of completion and prior to final acceptance by the architect; said tank in its damaged condition failed to conform to the Contract Documents; the architect rejected said damaged tank and ordered the Defendant to correct said non-conforming work; and the Defendant breached its' contract with the Plaintiff by failing and refusing to replace said tank."

We think the trial court was correct in this finding.

In that we have determined that Linfoot did breach its contract with the School District, it is unnecessary to review the findings of the trial court which also found that Linfoot breached an express warranty, and that its negligence was the proximate cause of the damage.

Having determined that Linfoot breached its contract with the School District, and there being no issue before us dealing with the determination of the amount of damages, we affirm the judgment of the district court.

VOGEL, SAND and PAULSON, JJ., concur.

PEDERSON, Justice, concurring specially.

The majority opinion points out one of the contract terms (General Conditions, Supplementary Conditions and Modifications, 0104, Section 8) which provides, in part, that claims for damages by either party against the other "shall be adjusted by agreement or arbitration." Although much of Section 8 is ambiguous, the quoted portion clearly is not. The school district chose to proceed to seek adjustment of its claim in the district court and Linfoot made no objection thereto. Nonetheless, we should not ignore a specific and unambiguous provision that was agreed upon when the contract was executed.

If this issue had been raised I would not have reached any result different than that reached by the majority because the dispositive question is entirely one of law and not of fact. It is my position that the judiciary cannot be deprived of jurisdiction to decide legal questions by reason of an agreement between parties or by an enactment of the Legislature. See my dissent in *West Fargo Public Sch. Dist. v. West Fargo Ed.*, 259 N.W.2d 612 (N.D.1977).